[Civ. No. 11486. Third Dist. Feb. 21, 1968.]

FRANCO WESTERN OIL COMPANY, Plaintiff and Appellant, v. AUBREY FARISS et al., Defendants and Respondents.

McCutchen, Doyle, Brown, Trautman & Enersen, James D. Adams, Burnham Enerson, John R. Price, and J. Thomas Rosch for Plaintiff and Appellant.

Crowley & Gofin, Ben Levin and Arthur J. Crowley for Defendants and Respondents.

PIERCE, P. J.—On December 22, 1960, plaintiff (hereinafter "Franco Western"†) sued defendant Cameron,** doing business as Cameron Oil Company. The controversy relates to the ownership of oil and gas leases in the Meridian area of Sutter County. Franco Western sought to establish ownership of a one-half interest in those leases, a concomitant of a joint venture between the parties. It has appealed from a defense judgment following the motion of defendant Cameron (hereinafter "Cameron") under Code of Civil Procedure, section 631.8. That section enacted in 1961 (Stats. 1961, ch. 692, § 2) authorizes, *inter alia,* a defendant in a trial by the court to move for a judgment upon the close of his opponent's case. The judge weighs the evidence. Upon the court's determination to grant defendant's motion, findings are made, followed by a judgment—which is on the merits. Such findings and a judgment were made here.

By its findings and judgment the trial court sustained defendant's position that no joint venture agreement was entered into between the parties covering the leases in controversy and that Franco Western had no interest in those leases. Franco Western's principal contention, among several on appeal, is that the findings and judgment are not supported by substantial evidence. We hold its argument sound.

Our study of the trial court's findings makes it clear that it reasoned in the following progressive steps: (1) the parties *intended* to enter into a joint venture regarding the leases in the area in controversy; but (2) consummation of a written operating agreement was also intended, and (3) the parties did not intend to be bound to any agreement unless a *written*

---

†Plaintiff Franco Western Oil Company's interests in the litigation and in the oil and gas leases involved therein have been transferred to others. Franco Western remains the named plaintiff. (Code Civ. Proc., § 385.)

**Defendant Cameron has died. His personal representatives have been substituted as defendants. Individual defendants are named. They are persons to whom Cameron assigned interests in the leases after the controversy arose. Their rights, if any, depend upon Cameron's rights. For convenience we refer to defendants in the singular as "Cameron."

*operating* agreement was reached; (4) no written operating agreement was reached. Therefore, no joint venture agreement existed. Our study of the record convinces us that substantial evidence supports steps (1), (2) and (4). We are compelled to hold, however, that step (3) was *not* intended; that the evidence is without substantial conflict that the parties *did* intend a joint venture effective January 19, 1960; that although they looked forward to a written operating agreement ultimately, it was not a condition to the origin of the joint venture. Other contentions by both parties will be involved in reaching our conclusion but need only be given light-brush treatment.

Before stating facts, we make some observations. First, the record is voluminous.[1] Secondly, this court with its research staff has had an advantage over the trial judge. We have had months to familiarize ourselves with the record. The trial court had the advantage of observing the demeanor of two witnesses on the stand. That advantage which often looms large on appeal is minimized in this case since, as the discussion to follow and the findings made indicate, the trial judge gave full credence to the testimony of plaintiff's witnesses. Also, virtually all of the testimony is corroborated by documentary evidence. The validity of those documents is not challenged.

The next observation preliminary to our statement of facts relates to the rules obligatory upon an appellate court reviewing records and findings upon which a judgment under Code of Civil Procedure, section 631.8 is based.

In *Greening* v. *General Air-Conditioning Corp.* (1965) 233 Cal.App.2d 545, at pages 550-551 [43 Cal.Rptr. 662], this court stated the purpose of the "motion for judgment" created by the 1961 enactment of Code of Civil Procedure, section 631.8 and the distinction between a reviewing court's permissible perspective in considering the evidence on an appeal from such a granted motion and its function when a granted nonsuit is involved. In the latter review the truth of the plaintiff's evidence must be assumed. ■ "The new motion-for-judgment procedure requires the trial judge to weigh the evidence . . . [and make findings]. . . . If the motion is granted, his findings are entitled to the same respect on appeal as any other findings and are not reversible if sup-

---

[1]There are 21 volumes of reporter's transcript. Yet, only two witnesses were actually before the court. Five depositions were wholly or partly read into the record. More than 133 plaintiff's exhibits were introduced. Defendant's exhibits total 74—our quick count.

ported by substantial evidence. [Citations.]"[2] (P. 550.) We will apply the "substantial evidence rule" in our discussion of the plaintiff's evidence upon which the findings were made and the case decided, and we will give to that evidence all inferences favoring defendant reasonably permissible. We must remember, however, that evidence to be substantial must be evidence which is of ponderable legal significance and reasonably to be believed. (*San Bernardino Valley Water Dev. Co.* v. *San Bernardino Valley Municipal Water Dist.* (1965) 236 Cal.App.2d 238 [45 Cal.Rptr. 793] (hearing denied); *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; see also *Fewel & Dawes, Inc.* v. *Pratt* (1941) 17 Cal.2d 85, 89 [109 P.2d 650].) Much of the oral testimony is backed up by confirmatory written instruments. The latter are unambiguous. When the trial court interprets an unambiguous written instrument uncontradicted by parol evidence, that interpretation becomes a matter of law, and a reviewing court is not bound by the trial court's construction. (*Pope* v. *Allen,* 225 Cal.App.2d 358, 365 [37 Cal.Rptr. 371]; cf. *Stevenson* v. *County of San Diego* (1945) 26 Cal.2d 842, 844 [161 P.2d 553].) With these rules in mind, we find no real factual dispute in the record.

## STATEMENT OF FACTS

To aid in an understanding of the facts a reference map is included on the next page. Except that it is uncolored and unmarked, it is a copy of Plaintiff's Exhibit No. 3.

Prior to October 1959 Franco Western had 36 oil and gas leases in Sutter and Colusa Counties in an area known as the "Grimes Block." On the map they are entitled "Franco Western Original Grimes Block." The area is represented by parallel diagonal lines slanted downward from left to right. Two dry test wells had been drilled by Franco Western. Unless someone else could be found as operator to drill another well, it had determined to quitclaim its interests in the area.

### The Grimes Farmout Agreement.

On October 13, 1959, Franco Western and Cameron entered into a written agreement. It is in letter form and attached to

---

[2] We cannot accept the following statement to the contrary in *Dennis* v. *Caroline Pines Bowling Center* (1967) 248 Cal.App.2d 369, at page 377 [56 Cal.Rptr. 453]: ''The same rule governing a nonsuit is applicable to motions under the above section. (*Elzarian* v. *Wiser,* 216 Cal.App.2d 506, 515 [31 Cal.Rptr. 126]) , . . .'' Incidentally, the *Elzarian* case cited does not support the statement. Its inference is to the contrary.

it is a "model" form of operating agreement. The court's findings call the instrument as a whole the "Grimes Farmout Agreement." By its terms Cameron agreed to drill at his expense a 7,500-foot test well in the Grimes Block in consideration for which he was (1) to receive a one-half interest in said leases, and (2) was to operate them. Paragraph 9 of the agreement is set forth in full in the findings. (VI) Effectually, it provides that if either party acquired an oil and gas lease or operating interest in lands in any section containing lands covered by the operating agreement "or in any section *adjacent* to such a section" the other party would be notified and have the right to exercise an option to purchase a one-half interest therein at cost. (Italics ours.) The paragraph 9 area is referred to by the parties as a "Buffer Zone." The parties differed as to their interpretation of the perimeter thereof. Franco Western's interpretation is that shown on the map by a broken line; Cameron's interpretation is that shown by a dotted line. The dispute was put in issue by the third count of

the complaint. In this one respect the court's findings and judgment were in favor of Franco Western. (See finding VII.) By the Grimes Farmout Agreement the parties concededly became joint venturers as to the Grimes Block and the Buffer Zone. Pursuant to the agreement Cameron drilled a test well in the Grimes Block. Known as the Armstrong well, it is shown on the reference map in the northerly portion of the Grimes Block by name, by an asterisk, and by a date, "12-8-59." Drill stem tests reflected it would probably be a commercial producer of gas.

*The December 10-11 Exchange of Telegrams.*

The parties felt they had "a very good discovery" and decided to take steps to protect themselves against competition. Campbell, Franco Western's president, related a telephone conversation with Cameron on December 10, 1959, in which this was discussed. On December 10, 1959, Cameron sent Franco Western a wire stating "we" are attempting to purchase leases adjoining the Grimes Block, and that "It is our mutual understanding and agreement that you may have ½ interest if you elect and also if you pick up leases or make a deal with Reynolds and or associates or others we will have a ½ interest if we elect." The wire stated the acquiring party would pay one-half the costs of acquisition. Franco Western's wired reply sent by Campbell stated: "[W]e agree that if we make a deal with Reynolds or if we purchase leases adjoining our Grimes California Block we will offer you one-half interest for which you will bear one-half of cost. We also understand that you agree to offer us one-half interest in any leases you purchase adjoining our Grimes Block for which we will bear one-half of cost.'"[3]

*Meridian Prospect, Sanborn Agreement, January 19, 1960, Agreement.*

In December 1959 Cameron and Campbell had also discussed the joint acquisition of various other leases *outside* the Buffer Zone. In one of those conversations Cameron told Campbell that he was negotiating with landowners to the

[3]The "Reynolds" mentioned was owner of oil and gas leases covering a substantial area northwest of Grimes. These are denominated on the reference map and indicated by vertical lines. It will be noted that the area encompassed is partly within and partly outside the Buffer Zone. (In a subsequent telephone conversation Campbell and Cameron agreed that the latter would ascertain whether Reynolds' leases were available. Later Cameron discovered they were not, Reynolds having made a deal with others.)

north for leases. That is in an area which became known as the "Meridian Prospect." Cameron also told Campbell he thought a well commitment would be required before the leases could be obtained. Starting on December 10, 1959, Franco Western tried to obtain leases first within the Grimes Block, then extending away therefrom to the northwest.

In January 1960 Cameron entered into an agreement with H. L. Sanborn & Sons (called the "Sanborn Agreement"). That firm was a landowner but acted not only for itself but for other landowners in the area. That area is entirely within the "Meridian Prospect" as shown on the reference map. (Said Meridian Prospect is indicated by parallel diagonal lines slanting downward from right to left.) It will be noted that part of the area is within, part without, the Buffer Zone. (Thus, the Meridian Prospect overlaps the Buffer Zone.) Some of the Sanborn Agreement leases are located within the Buffer Zone. The greater portion are outside. Under the Sanborn Agreement, Cameron, as part consideration for the leases, had agreed to drill a 7,500-foot test well within the area by Christmas 1960. (To retain the leases another well had to be drilled within a year thereafter.) He was required to, and did, post a surety bond for $75,000 to secure performance of the drilling of the first well.

A key factor in plaintiff's claim is an alleged agreement of January 19, 1960. (Franco Western in its complaint refers to this as a particularization of the December 11, 1959, agreement—see below.) One Spielberger was Cameron's manager of exploration. The head office of Cameron Oil Company is in Oklahoma City. It appears that Spielberger was in charge of that office. Campbell testified, it is uncontradicted, and the court found, that on January 19, 1960, Spielberger telephoned Campbell. He introduced himself and stated that Cameron had acquired leases covering approximately 8,000 acres in Township 15 North, Range 1 East. (This is within the Meridian Prospect.) The prices had been $2.00 an acre and a one-sixth royalty. In addition to the test well which, as stated, had to be drilled by Christmas, he mentioned the second well to be drilled within two years. The surety bond of $75,000 was mentioned. (In short, effectually he *described,* among other things, the Sanborn Agreement.) Spielberger described the sections within which the 8,000 acres were located. He told Campbell that Cameron expected to increase the leased acreage to between 10,000 and 12,000 acres but might have to increase rental payments to five or perhaps ten dollars an acre. Campbell testified: "He told me he was calling to re-

affirm that we could have a half interest in this block if we wished, and that we could have that for paying our share of the lease acquisition cost, the lease rentals, the performance bond and the rest of their costs. I told him that we accept it. That I accepted on behalf of Franco Western Oil Company. He then told me that he had told Ben Payne to send me a map which would show the area on which they had acquired leases and show the area in which the well had to be drilled in order to validate the requirement of that agreement."

Campbell also testified that Spielberger in the conversation estimated the total acquisition costs (not including the well drilling) would be between $30,000 and $35,000. Campbell produced scribbled notes of the telephone conversation made while that conversation was in progress. They are in evidence. They do not contain a reference to Campbell's acceptance of Spielberger's offer. At that time, however, Campbell kept a diary of business events of the day. (That fact is before us because the whole spiral notebook, constituting his diary during the period in controversy, is lodged with us, although only entries offered by defendant were admitted into evidence. An important entry offered by plaintiff was refused admittance. (Plaintiff's Exhibit 21 for identification.) It is a memorandum entry in Campbell's handwriting. It states in part: "1:45 Fred Speilberger [sic] Arthur Cameron Re: land acquisition near Grimes play Reaffirmed that we could have ½—they will accumulate costs and start sending copies of documents. I accepted. Hadn't decided on 15N 1W commitments. . . ." This entry should have been admitted. We pass upon it since the question will be before the court on the resumption of the trial hereinafter directed. It was admissible under the statute on business records (formerly Code Civ. Proc., § 1953f, now Evid. Code, § 1271). It was effectually a business log and, as such, admissible. (*Gallup* v. *Sparks-Mundo Engineering Co.* (1954) 43 Cal.2d 1, 7 [271 P.2d 34].) The fact Campbell had already testified substantially to the same facts did not make this relevant testimony inadmissible. It was corroboration, and *strong* corroboration, of an oral acceptance now vigorously denied by respondent. (Denial is via another entry in the log, Defendant's Exhibit L.) That too was the record of a Spielberger call at 10:05 a.m., February 8, 1960: "Wanted decision on whether or not we wanted ½ of all leases they had taken—yes-.") We do not read that statement as permissibly inferring there had been no previous agreement. It infers only a reaffirmance.

Franco Western during the period after the Grimes Farm-out Agreement had been acquiring leases in Township 15 North, Range 1 *West* (the area in the northwest indicated by the dotted area on the map). It will be noted that these lands do not *adjoin* the Grimes Block. Thus, they are neither within paragraph 9 of the October 1959 agreement nor within the December 10th and 11th exchange of telegrams. (There was one exception. A lease from the Southern Pacific Company along its right of way extended from the Grimes Block north-ward through Township 15 North, Range 1 West.) (The Franco Western leases in Township 15 North, Range 1 West, will hereinafter be called the "northwest" leases.) Spielber-ger on January 19th had asked for the opportunity to share in those leases. Campbell in that telephone conversation (as he testified and as the "log" of that conversation confirms) had told him that Franco Western would take it under considera-tion but that he could not give him an answer at the time.

On Janury 22, 1960, Campbell received a letter dated Janu-ary 19, 1960, written by Speilberger for Cameron. It contained a photocopy of the Sanborn agreement as an enclos-ure, also a photocopy of the bond. Substantially, it duplicated the subject of the telephone conversation related above *minus any reference to Franco Western's acceptance.* The letter refers to the acreage as the "North Meridian Prospect." It refers to Cameron's offer as being *"In addition* to the pur-chases that will become subject to our operating agreement of October 13, 1959. . . ." (Italics ours.) Since the letter did not refer to Campbell's acceptance, in fact did not refer to the telephone conversation at all, Campbell assumed it had been written and dispatched before the conversation. This, we think, is the only logical assumption.

Campbell did not immediately answer the letter. However, both parties immediately acted upon the telephoned agree-ment. A letter enclosing a map of the Meridian Prospect with the leases already obtained was sent by Cameron's landman Payne on February 3, 1960; invoices billing for "general and administrative" expenses incurred in January were sent in February, etc.

*The Campbell Letter of May 13, 1960.*

In May Spielberger telephoned Franco Western's landman, H. R. Bilton, asking written confirmation. On May 13, 1960, Campbell dispatched the requested letter. It reads as follows: "With reference to the request you made to Mr. Bilton yes-terday, this will evidence Franco Western Oil Company's

election to accept your offer of a one-half working interest in the block of acreage you have acquired adjacent to our Grimes block in Township 14 North, Range 1 East and Township 15 North, Range 1 East, which you call your 'Meridian Block.' Sincerely yours, H. D. Campbell.'' The letter is in evidence. Receipt by ''Cameron Oil Co.'' at 9:30 a.m., May 16, 1960, is shown on the face of the letter.

*Conversations, Communications and Office Practices After January 19.*

Plaintiff points to various activities between the parties during the 9-month period from mid-January to October 1960 consistent with the joint venture respecting the Meridian Prospect.[4]

Invoices for both lease-acquisition costs (including those outside the Buffer Zone) and Franco Western's share of general and administrative expenses refer to ''the Meridian Prospect'' or ''our Meridian Prospect.''

---

[4]There was, for example: (1) A request by Cameron for, and a contribution by Franco Western to, the Meridian Fire Department. (The significance of this minor incident is that the town of Meridian is miles to the north of the northerly boundary of the Buffer Zone—where defendant now claims the parties joint venture terminated—and Cameron's letter of request speaks of the fire department as being ''composed primarily of our lessors in the Meridian Prospect.'') The amount of the contribution was included as an item of ''GENERAL AND ADMINSTRATIVE EXPENSES FOR MERIDIAN PROSPECT'' in Cameron's invoice to Franco Western. (2) A geophysical survey was extended to the Meridian Prospect. The survey was recommended to Campbell by Franco Western's geologist; authorization was given and the matter was taken up with Cameron's geophysicist who in turn recommended it to Cameron. The latter gave his consent. The landowners, however, had granted leases to Cameron. Without his consent the exploratory survey could not proceed on their lands. Assignment of leases or permission from Cameron was needed. On March 1, 1960, and again on March 4th Cameron wrote Campbell giving his approval. The survey was made in April 1960. It included that part of the Meridian project north of the Buffer Zone. Franco Western paid for the survey, billed Cameron for one-half the cost, a bill which Cameron paid. (3) Also in April 1960 Franco Western's landman, Bilton, inquired of Spielberger when Franco Western could expect to receive assignments of its one-half interest in the other leases. Spielberger explained the leases required a consent from the lessors to any assignment and later told Bilton the consents were being obtained. (4) There are references in both Franco Western's records and Cameron's records to the leases in the Meridian Prospect outside the Buffer Zone as being jointly owned by the parties. (5) During the period in question Cameron sent to Franco Western invoices totaling $11,966.26 for lease ''ACQUISITION COSTS'' and ''GENERAL AND ADMINISTRATIVE EXPENSES'' for the Meridian Prospect. Covering letters so referred to the invoices. All except one of the invoices (the amount of which was questioned and returned for revision) were paid by Franco Western. Some items included were: the bond premium mentioned above ($937.50 per annum, of which Franco Western was billed for and paid one-half),

*The Hensen, Chesini and LeBaron Leases.*

Among the leases in the Meridian Prospect (from one-half to two and one-half miles outside the Buffer Zone) were the Hensen lease, dated January 4, 1960, the Chesini lease and the LeBaron lease, both dated April 25, 1960. They were obtained by Cameron. They were also initially paid for by Cameron. They were taken out, however, in Franco Western's name and using the latter's forms. Franco Western was asked to and did reassign a one-half interest in those leases to Cameron. Cameron also billed Franco Western for, and Franco Western paid, one-half the cost of those leases with one unexplained exception. As we will mention below, a Cameron Company representative admitted destroying records indicating the existence of the joint venture after Cameron's October "repudiation." One record not destroyed was Cameron's Oklahoma City office's LeBaron lease card. It refers to Franco Western and Cameron as being "partners" in said lease. So does a letter from a Cameron Oil Company's representative to Franco Western regarding the Hensen lease dated March 29, 1960. It reads in part: "Inasmuch as A. A. Cameron and Franco Western will be *partners* in this prospect we would appreciate you assigning us half interest in the above lease." (Italics ours.)

*Drilling of the McLaughlin and Sanborn Test Wells.*

The geophysical work (referred to in footnote 4) was completed in April 1960. Under the Grimes Farmout Agreement following the drilling of the Armstrong test well, a second test well was to be drilled. As has been noted, a well also had to be drilled under the Sanborn Agreement. Upon completion of the geophysical work, the parties commenced to negotiate regarding the drilling of the latter two wells. The well to be drilled under the Grimes Farmout Agreement was called the

first year rentals on some of the Meridian Prospect leases—above the Buffer Zone—lawyers' fees for preparation of the Sanborn agreement, proportionate salaries of Spielberger and other Cameron landmen, travel expenses of other Cameron employees, title company charges and lessors attorneys' fees in connection with Meridian leases, etc. The first year rentals of the leases obtained under the Sanborn agreement were not billed to Franco Western, nor did Franco Western request such billing. Such invoices, however, had been prepared by Cameron's accounting department, but after the dispute between the parties arose they were not sent to Franco Western. Since apparently the non-billed invoices included the leases within the Buffer Zone (and no part of the record referred to us indicates anything to the contrary), an area in which Cameron agrees Franco Western is entitled to participation, the non-billing can have no significance.

Helen McLaughlin test well. (It is shown on the reference map in section 5; T. 14 N., R. 1 E.) Details of these negotiations we cover in a footnote.[5]

The McLaughlin well, in the Grimes Block, was drilled in June 1960. Late that month it was apparent that it was a successful gas well.

Since the McLaughlin test well was successful, it was determined to drill the test well required by the Sanborn Agreement in the southerly portion of the Meridian Prospect —the part which overlaps the Buffer Zone. That well came to be known as the "Sanborn well." Franco Western wrote to Cameron at his Beverly Hills address July 6, 1960. The location for the drilling of the Sanborn well was finally fixed in that letter. Cameron personally endorsed a counterpart of that letter, "ACCEPTED AND AGREED TO: This 7th day of July, 1960," and returned it to Franco Western.[6]

The Sanborn test well was drilled in August 1960. Drilling demonstrated that that test well would be successful also. *Cameron invoiced Franco Western for $94,000 as half the cost of the well. Franco Western promptly paid the invoice.*[7]

---

[5]On May 20, 1960, Cameron's chief geologist, Isbell, wrote to Campbell. The letter covered both the McLaughlin test well and the test well to be drilled in "our jointly owned Meridian block." A tentative location is suggested. A meeting of representatives of both parties was held in Franco Western's office in Bakersfield on June 2, 1960. Both wells were again discussed. It was suggested that selection of the location of the Meridian Prospect test well should depend upon the fate of the drilling of the McLaughlin well. Should the latter be a poor well or a dry hole, then the Meridian Prospect (Sanborn) test well should be drilled further north—above the Buffer Zone. A letter dated June 3, 1960, from Spielberger to Campbell expresses the agreement reached in Bakersfield. It is in evidence. On June 8, 1960, a letter was written from Campbell to Spielberger. It also refers to "our jointly owned Meridian prospect," and constitutes an agreement to drill the Sanborn well at a location to be agreed upon. A counterpart in evidence is endorsed: "Agreed to this 22 day of June, 1960." It was signed by Spielberger for Cameron Oil Company. Letters of June 23, 1960, Spielberger to Franco Western, and June 29, 1960, Spielberger to Franco Western, both refer to the same subject matter. When speaking of the Sanborn well they refer to "our jointly owned Meridian prospect," or to "our Meridian area block."

[6]In respondent's brief there is a statement (which seems to be a suggestion rather than a contention), that Spielberger, although he was Cameron's "Exploration Manager," was in charge of its head office and carried on most of the negotiations for Cameron Oil Company, was not proven to have had authority. The above letter endorsed personally by Cameron would dispel any doubts. The court found no lack of authority and there could have been none. The record shows many contacts between Campbell and Cameron and knowledge by the latter of the negotiations.

[7]Respondent's brief notes that Campbell in one place in his testimony refers to the Sanborn well as having been drilled under the Grimes Farmout Agreement. Elsewhere Campbell refers to it as having been drilled

*Franco Western's Offer re the Northwest Area.*

It has been noted above that Franco Western's leases in the northwest area (see map) did not, with one exception, lie *adjacent* to the Grimes Block. They did not, therefore, fall within the Grimes Farmout Agreement. It has also been noted that Spielberger, under the January 19, 1960, agreement had asked that Cameron be granted an option to acquire a 50-50 joint interest therein, and Campbell had agreed to consider the proposition. Our attention has not been directed to any follow-up on that request by anyone connected with Cameron until June 1960. In June Campbell at the request of someone in the Cameron organization orally offered to Cameron a one-half interest in leases in the northwest portion of the Buffer Zone. On July 7, 1960, he offered participation in all the northwest leases to Cameron in writing. The offer was subject to Franco Western being the "operator" of those leases under an operating agreement which *was* to be a condition precedent. The offer was not accepted. July 26, 1960, the offer was withdrawn.

In October Cameron, as Franco Western puts it, "repudiated" the alleged Meridian Prospect joint venture and this suit followed. In Cameron's "repudiating" letter dated October 3, 1960, to Campbell, Cameron refers (apparently for the first time) to "*my* Meridian Block." (Italics ours.) With the letter he sent a schedule of leases which he *then* contended were "jointly owned." This schedule includes only leases within the Buffer Zone. The letter from Campbell dated May 13, 1960 (which we have quoted in full above) was relied upon in Cameron's letter of October 3d as authority for his contention. The letter also, for the first time, disclaims Spielberger's authority.

Franco Western charges that after the October 1960 "repudiation" Cameron destroyed or "failed to produce" many documents contained in his files which, if available, would constitute significant evidence. Specifically named and supported by proof is the destruction by Cameron landman, Hobson, of all California copies of the original LeBaron lease

---

under the Meridian Prospect joint venture agreement. Analysis demonstrates both statements are true. The well was located within the Buffer Zone. All wells drilled there could be said to fall within the October 1959 agreement. Since it just *happened* to be drilled within the Buffer Zone— because the McLaughlin well was a success—it is more accurate to describe it as a Meridian Prospect test well. It is also more accurate to so refer to it since it was a great stride in proving that the leases of the Meridian Prospect were valuable.

rental card. (Hobson admitted this.) One copy, however, was discovered by Franco Western in Oklahoma City. It shows Franco Western to be a "partner" in the ownership of the lease. That counterpart of the card is in evidence. It is unnecessary to recount herein all the detailed circumstantial evidence relied upon by Franco Western tending to confirm its charge.

*The Parties' Negotiation for an "Operating Agreement."*

It is admitted by Franco Western that the parties contemplated a written operating agreement ultimately as exemplified by the "MODEL FORM OPERATING AGREEMENT" which forms a part of the Grimes Farmout Agreement. That agreement form specifies the names of the parties and their respective fractional interests in the leases of an area called the "unit area." One of the parties is designated as the "operator." He controls, under conditions therein set forth, the drilling of test wells to prove up the area. Drilling of a "dry hole" may result in termination of the agreement. Drilling of a successful test well may result in various plans of future production. Terms regarding the sharing of the costs of test wells vary. The foregoing will show that the parties, although they did not have a formal written "operating agreement," did have, from January 19, 1960, at least "an agreement to operate" jointly held leases in the Meridian jointly. The parties were named, the leases were fixed, the 50-50 interests of each party therein were specified. Cameron was to be the operator; the parties were to share the first test well's costs 50-50. There is no evidence that it was either the practice of these parties or the custom of those engaged in oil and gas well exploration to constitute a written agreement a condition precedent to a joint venture of the type here involved. There was direct testimony by Campbell to the contrary regarding Franco Western's policy respecting some of its joint ventures. (It has been noted, however, that in its offer to Cameron of a half interest in Franco Western's northwest leases an operating agreement *had* been made a condition.)

The fact that Franco Western was interested in an ultimate written operating agreement is evidenced by Campbell's expression to Bilton of a wish that the latter should negotiate such an agreement with Spielberger. Bilton had assumed "right or wrong" that Cameron would be the operator under the agreement. He testified he considered the agreement

important. Bilton also testified that Campbell was agreeable to the combining of the Grimes and Meridian areas into one new operating agreement but without a paragraph 9 type buffer zone for the new area. In conversations between Spielberger and Bilton it also appeared that Cameron wanted to be permitted to make assignments to "specifically named" persons. Campbell wanted to obtain title insurance on leased lands. This was in June. Bilton agreed to prepare a draft. No draft was prepared prior to Cameron's repudiation. The reason is subject to surmise. The operating agreement would have covered the Grimes Farmout Agreement leases, the leases offered by Franco Western and the leases in the Meridian Prospect. The parties had not reached an agreement covering the northwest leases.

## THE PLEADINGS

Respondent's brief makes a primary contention that appellant's argument is "a patently erroneous statement of the case" since having pleaded one contract and having relied upon that contract at the trial Franco Western is now urging another on appeal. Specifically, it is charged that Franco Western pleaded a December 11, 1959, agreement and has now switched to a January 19, 1960, agreement. We can find no merit to the charge, but it has sent us to the pleadings for a wholly unnecessary and time consuming study. We set forth the results in a footnote.[8]

There is no merit to respondent's contention of variance.

---

[8]The case was tried on a third amended complaint containing three counts. In the first count the facts, substantially *all* of them, are set forth in evidentiary detail as we have outlined them above. The December 10th and 11th exchange of telegrams are set forth as exhibits. Those exhibits are pleaded as the origin of the "joint venture" agreement thereafter "elaborated." Unavailability of the Reynolds leases is alleged and the consequent direction of interest to the acquisition of leases in the Meridian Prospect. It is then alleged: "By January 19, 1960, the leasing picture had become well enough defined to permit the particularization of said joint venture agreement." Its area and boundaries are set forth in a map exhibit. The Sanborn agreement covering 2,640.71 acres is then alleged. Its requirement for the drilling of a well at a cost of $188,107.58 and the further requirement for the $75,000 bond are related. The January 19, 1960, oral agreement, as we have stated it above, is spelled out. It is specified as the "joint venture agreement." Cameron Oil Company's January 19, 1960, letter written before the consummation of the alleged joint venture (but stating its terms with specific detail) is made an exhibit, as is a plat of the Meridian Prospect. Facts are alleged showing performance of the joint venture: payment of the bond premium, one-half by each party, acquisition of leases covering 1,000 more acres between January 19, 1960, and June 11, 1960; drilling of the test well; sharing of its costs; incurrence of other administrative and executive expenses and the sharing thereof, etc. A list of the leases acquired is

## The Findings

Essentially the court's findings where they relate to evidentiary matter are in Franco Western's favor. The Grimes Farmout Agreement of October 13, 1959 (admitted by both parties) is spelled out, including paragraph 9. Plaintiff's interpretation of the perimeter of the Buffer Zone is adopted. The drilling of the Armstrong well is stated plus the fact that such drilling reflected the fact that it would probably produce gas. The sending of the December 10th and 11th wires is found (in paragraph X).

The court finds also the following facts: the January 19, 1960, telephone conversations between Spielberger and Campbell as it was related by Campbell and the letter sent on that date (XI); invoicing by Cameron of plaintiff for leases beyond the Buffer Zone (XX); the method of the acquisition of the Hensen, Chesini and LeBaron leases, including the fact they were taken in Franco Western's name (XIX); the acquisition by Franco Western of leases in the northwest area and acquisition by Cameron of the leases in the Meridian Prospect generally (XIII); the Sanborn agreement and its terms (XVII); the dilling of the McLaughlin well and of the Sanborn well (XIV); the offer of July 7, 1960, by Franco Western to Cameron for the latter to participate in the northwest leases (XV).

But the December 10-11, 1959, exchange of telegrams is characterized as "counter proposals" (X), and the December 1959 and January 19, 1960, transactions are both declared not to have constituted a joint venture or any other agreement, it having been intended by the parties that before there could be any agreement a formal written "joint venture and operating agreement . . . encompassing the ownership, management and operation of the leases," the drilling of wells (presumably including *production wells*) with the rights, duties and obli-

---

appended. Cameron's October 1960 repudiation is alleged. A second count (incorporating the first count by reference) adds a detailed story of the acquisition by Cameron of the Hensen lease. It alleges the obtaining by Cameron of a substituted lease by false representations. The third count sets forth paragraph 9 of the October 13, 1959, agreement and includes plaintiff's contentions regarding the perimeter of the Buffer Zone lands. The prayer: (1) that plaintiff be declared an owner of an undivided one-half interest in the Meridian Prospect leases and that Cameron be declared to hold such interest as a constructive trustee; (2) that he be ordered to convey to Franco Western that one-half interest; (3) that the same order be made as to any leases obtained by Cameron which are unknown to Franco Western; (4) that Franco Western be directed to pay any sums due from it to the joint venture. . . .

gations of the parties, each to the other, set forth. (X, XI, XII.) Such an agreement, it is found, was never made although there were negotiations therefor (XIV).

It is found that Franco Western was not interested in completing any agreement meeting the condition prescribed until both the McLaughlin and Sanborn test wells were completed because until those events Franco Western believed the land "beyond the buffer zone [and presumably the court means in the *Meridian Prospect area*] was of little value." The parties are found to have participated in the Sanborn leases but only in the portion of the Sanborn agreement leases lying within the Buffer Zone. Notwithstanding that limited extent of participation, Franco Western was found obligated to pay a full one-half of the cost of drilling the Sanborn well (XVII) (and again we presume the court intended to find Franco Western was obligated to pay a full one-half of the premium on the $75,000 bond since there is no provision for any refund (XVII).) The court rejected Cameron's contention that the invoicing of bills to Franco Western was, as testified by Cameron's representatives, for "information" only. It found that such invoicing and payment was upon the assumption there would be a joint venture and operating agreement. A refund was ordered.

## Our Holding

We can find no support in the record for the nonevidentiary findings. The telegrams of December 10th and 11th were not "counter proposals." Together they constitute an offer and an acceptance. That is true on their face. No other evidence dispels that construction. The fact that different language was used in the acceptance than that in the offer is, under the circumstances of this case, inconsequential. No new terms were added. (*Schreiber* v. *Hooker* (1952) 114 Cal. App.2d 634, 639 [251 P.2d 55].) Actually, the only significance we see in the December telegrams is reaffirmance of paragraph 9 of the Grimes Farmout Agreement. No leases outside the Buffer Zone are referred to. The January 19, 1960, agreement—oral but with its essential terms prewritten in Spielberger's letter of that date and with its written reacceptance May 13, 1960—is another matter. It is a specific offer and acceptance to share ownership in leases in the Meridian Prospect *outside* the Buffer Zone. *And it is an agreement to operate these leases through the drilling of test wells*. In brief, it is an agreement to buy and hold leases jointly and to bear the expense jointly to prove the value of the field. It was

acted upon. Leases outside the Buffer Zone were taken, some in Franco Western's name. A geophysical survey was made which partially proved the Meridian Prospect area outside the Buffer Zone. The first McLaughlin test well was drilled; then the Sanborn test well was drilled. True, the drilling of both wells *might* have been undertaken under the Grimes Farmout Agreement. But the acts of the parties, certainly the survey and the drilling of the Sanborn well, were performed not to prove the Grimes Block or the Buffer Zone *but to prove the entire Meridian Prospect.* The location of the Sanborn test well within the Buffer Zone was only happenstance.

We find not a bit of supporting evidence for the finding that either party had any intention that Franco Western's participation in the Sanborn leases was to be limited to those within the Buffer Zone. The evidence is all to the contrary. The January agreement makes no limitation. Franco Western bore its full one-half of the expenses to prove the *entire* group of leases. It paid its full one-half of the $188,107.58 Sanborn test well. It paid its full one-half of the premium on a $75,000 bond. It assumed its full one-half of a $75,000 obligation. (Civ. Code, § 2848; *Allen* v. *Freear* (1920) 50 Cal.App. 645, 647 [195 P. 748].) All of the evidence—the many references by both parties to their jointly owned Meridian Prospect leases when referring to leases outside the Buffer Zone, the unequivocal acceptance by Campbell in his May 13, 1960, letter of a "one-half working interest in" the Meridian Block, the Hensen, Chesini and LeBaron leases taken in Franco Western's name—all point to but one thing, the acts of partners to a well-defined, definitely understood area separate from that included within the Grimes Farmout Agreement (including its Buffer Zone). Those were not the acts of parties contemplating no presently binding agreement. One party does not agree to bear one-half of the costs of, and actually pour more than $100,000 into, a wildcat venture, the fruition of which leaves the reaping of all, or mostly all, the benefits to the party paying the other half. It may very well be, as respondent insists, and as the court found, that Franco Western did not highly regard the northeast (Meridian Prospect) area until the geophysical survey, the McLaughlin well, and the Sanborn well had demonstrated its potential. Nevertheless, *it thought enough of the prospect to spend much more than $100,000 on that wildcat venture.* Actually, to urge that Franco Western had no interest in northeast leases because it deemed them valueless while holding that it *had* obligated itself to pay

more than $100,000 to establish their value approaches a contradiction in terms.

As we have stated, it is conceded that *both* parties anticipated an ultimate written operating agreement; one which would embrace all their joint venture interests, the Grimes Block, the Buffer Zone and the Meridian Prospect. They also contemplated participation by other parties to be specified. The error of the trial court's reasoning, as we see it, is, however, that it seemingly equates a joint venture with the execution of such an operating agreement. It fails to recognize the logic, under admitted facts, of a joint venture to hold leases on a 50-50 basis and to share 50-50 the burden of the costs of proving the value of those leases. The findings of the trial court evidence an all-or-nothing interpretation of the parties' intent. The dealings of these parties under the facts established by *plaintiff's case* simply do not permit that interpretation.

We hold that *at this stage of the proceedings* plaintiff's evidence shows the parties by words, oral and written, and by deeds susceptible only of an inference confirming those words, now appear to be joint adventurers, each owning one-half of the leases in the Meridian Prospect, each entitled to one-half the benfits thereof, and each liable to bear the burden of one-half the leasing, administrative, test well drilling and other expenses.

The authorities fully support this contention.

■ A joint venture is an undertaking by two or more persons jointly to carry on a single business enterprise for profit, an enterprise in which they have a community of interest. Usually both a sharing of profits and of losses is involved. (*Lasry* v. *Lederman* (1957) 147 Cal.App.2d 480, 485-486 [305 P.2d 663], hearing denied.) ■ "Whether a joint venture exists must largely depend upon determining the intention of the parties from the facts of a particular case because there is no certain and all-inclusive definition to be applied." (*Holtz* v. *United Plumbing & Heating Co.* (1957) 49 Cal.2d 501, 506 [319 P.2d 617].) ■ A joint venture agreement may be oral. (*Lasry* v. *Lederman, supra; Hammer* v. *White* (1949) 90 Cal.App.2d 443 [202 P.2d 1029], hearing denied.) The last cited (*Hammer*) case involved an oral agreement to share equally in an oil and gas lease. (See also *Koyer* v. *Willmon* (1907) 150 Cal. 785 [90 P. 135].) ■ There is no requirement, the intention to form a joint venture being otherwise present, that the parties must agree upon the post-acquisition

management and operation of the property. (*Lasry* v. *Lederman, supra*; *Jaffe* v. *Heffner* (1959) 173 Cal.App.2d 512 [343 P.2d 374].) In fact a joint venture to acquire land *without any other agreement* is legally possible. (*Hendrickson* v. *California Talc Co.* (1942) 55 Cal.App.2d 467 [130 P.2d 806], hearing denied.) This court in *Sadugor* v. *Holstein* (1962) 199 Cal.App.2d 477 (hearing denied), at pages 480-483 [18 Cal.Rptr. 859], described joint ventures for the purpose of acquiring land, distinguished between partnerships and joint ventures (a distinction unimportant here) and pointed out that if such a partnership (or joint venture) is formed each party occupies the position of a trustee, who if he attempts to hold the jointly purchased land to the exclusion of his coadventurers (i.e., to "freeze" them out) becomes a constructive trustee. In *San Francisco Iron etc. Co.* v. *American Mill. etc. Co.* (1931) 115 Cal.App. 238 [1 P.2d 1008], a joint venture was held to be consummated when the minds of the parties meet as to the formation of the contract of joint venture. Also it was held that a joint venture could exist without explication of all details. There the court (on p. 246, quoting an Alabama case) says: " ' . . . The great majority of contracts of joint adventure and of partnership . . . do not point out precisely what each party is to do under them. Such a provision is quite unusual, and, we should say, quite impossible in many cases.' Such is the law in this state. . . ." (See also *Holtz* v. *United Plumbing & Heating Co., supra,* 49 Cal.2d 501, 507.)

The requisite intent may be implied from the conduct of the parties or established by direct evidence. (*Universal Sales Corp.* v. *California etc. Mfg. Co.* (1942) 20 Cal.2d 751, 765 [128 P.2d 665]; *Lyon* v. *MacQuarrie* (1941) 46 Cal. App.2d 119, 124 [115 P.2d 594].)

Here there was both direct evidence and unequivocal conduct of the parties showing an intent to form a joint venture relating to the Meridian Prospect outside the Buffer Zone; no substantial evidence permits a contrary finding.

The trial court has found an intent by the parties that the written operating agreement was to be a condition precedent to a joint venture agreement, or any agreement at all. "Intent" must be judged by manifestations of intent. The test is objective. "The law imputes to a person the intention corresponding to the reasonable meaning of his language, acts, and conduct." (*H. S. Crocker Co., Inc.* v. *McFaddin* (1957) 148 Cal.App.2d 639, 643 [307 P.2d 429], hearing denied.) In

our review of the evidence we can find no intent, express or implied, to create the conditions the court's findings have imposed. There was certainly nothing express nor can we find any conduct, custom or usage from which such an intent can reasonably be implied. (See Civ. Code, § 1655.)

In our study of the applicable law, we have not ignored the cases from other jurisdictions cited by respondent: *Bowmaster* v. *Carroll* (1928) 23 F.2d 825; *Chisholm* v. *Gilmer* (1936) 81 F.2d 120; *Henning* v. *Cox* (1945) 148 F.2d 586; *Feagin* v. *Champion* (1944) 195 Okla 116 [155 P.2d 518]. They are so patently distinguishable that discussion is unnecessary.

We judge this case wholly on the present stage of the record. Respondent's case is still to be heard.

Our holding makes unnecessary discussion of a point raised by appellant on appeal that under paragraph 24 of the operating agreement which is a part of the Grimes Farmout Agreement Franco Western by participating in the cost of drilling the test well is entitled to participate in the Meridian Prospect leases irrespective of the January agreement. We express no opinion thereon.

The judgment is reversed. The case is remanded for further proceedings, with the same effect as though said motion by respondent under Code of Civil Procedure, section 631.8 had been denied, and in accordance with the views expressed herein.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied March 20, 1968, and respondents' petition for a hearing by the Supreme Court was denied April 17, 1968.