[Civ. No. 23652.    Second Dist., Div. Three.    Nov. 16, 1959.]

BEN H. MYERS, Appellant, v. GLENN O. GAGER et al.,
Respondents.

Joseph R. Biafora and Alden F. Houck for Appellant.

Clifford A. Rohe, H. J. Gross and Harris K. Lyle for Respondents.

VALLÉE, J.—Appeal by plaintiff from an adverse judgment in an action for alleged breach of contract and for declaratory relief.

The action arose out of the following written contract:

"THIS AGREEMENT made and entered into this *17th* day of *November,* 1956, by and between GLENN O. GAGER, ETHEL GAGER and GRACE ELIZABETH ACKERMAN, hereinafter referred to as Owners, and BEN H. MYERS, hereinafter referred to as Broker;

"WITNESSETH:

"WHEREAS, the Owners now own, in fee, certain real property described as:

[description]

"WHEREAS, the Broker has represented to the Owners that he is desirous of attempting to have the said property re-zoned from its present zoning of R-A to C-2, for the purpose of constructing thereon a planned civic service center development; and

"WHEREAS, the parties are desirous of entering into an agreement for the purpose of permitting the Broker an opportunity to perform said services;

"Now, THEREFORE, IT IS MUTUALLY AGREED as follows:

"1—That the Owners hereby grant to the Broker, for the period of one (1) year from date hereof, the sole and exclusive right to make the necessary zoning applications to effect said change of zone, the Owners further agreeing that they will cooperate with the Broker in the filing of said applications, any such filing to be without expense or cost to the Owners.

"2—The Broker further agrees that he will pay all of the costs and expenses in connection with said zoning applications, and that he will further furnish, at his own expense,

plans and specifications for the development of said property, and the construction thereon of certain buildings, the type and nature of the buildings to be mutually agreed upon by the parties.

"3—The Owners further agree that, in the event the Broker is successful in obtaining said re-zoning within said one (1) year period, that they will, together with the Broker, cause to be formed a corporation, and will make the necessary applications for the issuance of stock in said corporation, said stock to be issued one-half ($\frac{1}{2}$) to the Owners, and one-half ($\frac{1}{2}$) to the Broker; that upon the formation of the Corporation, the Owners will sell to the corporation for the sum of One Hundred Thousand Dollars ($100,000.00) the real property hereinbefore referred to, said sale to be for Fifty Thousand Dollars ($50,000.00) cash and the balance to be represented by a first trust deed, with interest at six per cent (6%) per annum, interest and principal payable at not less than one per cent (1%) per month; the entire balance to be due and payable within seven (7) years. Said trust deed to contain a provision that the holders thereof will subrogate the same to construction loans for improvements to be placed upon the property, the nature and amount of construction loans to be approved by the Owners.

"4—The parties mutually agree that in the event the re-zoning is approved within the one (1) year period, and in the event the parties deem it inadvisable to develop the property, the parties agree that the property will be sold at a price to be mutually agreed upon, and that the Owners will receive upon said sale One Hundred Thousand Dollars ($100,000.00) net; that any sums received in excess of One Hundred Thousand Dollars ($100,000.00) will be divided equally between the Owners and the Broker. The parties further agree that said right of sale shall only extend for the one (1) year period hereinbefore referred to, and only in the event that the re-zoning referred to is obtained.

"5—The parties mutually acknowledge that time is expressly made of the essence of the within agreement, and in the event that the Broker has not completed the re-zoning of the property within a period of one (1) year from date, that all of the Broker's rights or interest in the said property shall cease and terminate, and that the Owners shall be free to deal with or dispose of the property in such manner as they may see fit."

Plaintiff's amended complaint alleged the contract had been modified prior to its performance by an oral agreement whereby the parties agreed to effect a change of zoning from RA to C1 rather than from RA to C2 as stated in the writing. It further alleged that a C1 zoning classification had been approved by the authorities; plaintiff had fully performed; defendants had refused to form a corporation and to discuss the sale of the property with plaintiff; and that plaintiff had thereby been damaged in the sum of $100,000. Defendants' answer admitted execution of the contract and denied all of the other allegations.

As a second cause of action, plaintiff alleged a controversy had arisen between the parties regarding their rights and duties under the contract and asked for a declaration thereof.

The court found: the contract was duly executed; it was modified prior to performance by oral agreement as alleged; no other modification was made; plaintiff applied for C1 zoning and the property was rezoned from RA to C1 solely as a result of plaintiff's efforts within the time limited in the contract. The court further found that none of the other allegations made by plaintiff was true, thus finding, in effect, that plaintiff had not fully performed and that defendants had not refused to incorporate or to discuss the sale of the property. The judgment was that plaintiff take nothing, that his claim was without any right, and that he has no right, title, interest, claim or estate in the real property.

The controversy involves the interpretation of the written agreement and definition of the rights and duties of the parties thereunder. Plaintiff does not directly contend that the findings are not supported by the evidence but he quarrels with the findings that he has not fully performed and that defendants have not refused to form a corporation and have not refused to discuss the sale of the property by his contention that the court misinterpreted the contract. His theory appears to be that the contract created the relationship of joint venturers; that the real property owned by defendants was an asset of the joint venture; that since no corporation was formed, he had a right to have the property sold for its reasonable value and the proceeds divided under the alternative clause in the contract; and that because defendants refused to agree to sell the property in response to advice from him that he had an oral offer to purchase for $150,000, they have breached the contract.

The contention that the contract created a joint venture cannot be sustained. The record is largely comprised of extensive parol evidence presented by plaintiff on the ground the contract was ambiguous, uncertain, and did not purport to incorporate all of the matters agreed on. There was much evidence regarding preliminary negotiations, prior and contemporaneous oral agreements, the circumstances under which the written contract was executed, the object of the contract, and the position of the parties at the time it was executed and their conduct with respect to it.

It appears that plaintiff, a real estate broker, first approached defendants, landowners, in an attempt to obtain a listing for the sale of their property, a 4½-acre parcel, including defendants' residence, which was adjacent to land upon which the city planned to erect civic offices. He was unsuccessful in this. After a number of conversations with them and after the city began building on the adjacent property, he sought to obtain their permission to offer an option to potential buyers to purchase the property, which would extend about a year while a determination could be made whether a zoning change could be effected. Defendants were not interested. Plaintiff then presented a sketch depicting a plan for the development of the property as a commercial and business section and offered to obtain a C2 zoning classification for the property.

The sketch showed defendants' property improved with commercial structures, including a gasoline station on a corner. Plaintiff testified, ''I told her [Mrs. Gager] that I would be willing to enter into a deal whereby if I was able to rezone the property and develop the property in the form of a corporation for such an arrangement and the corporation would purchase the property from them, pay them for the property, and we would each own fifty per cent of the corporation with the corporation having a liability for the property.'' He further testified he told defendants they would not have to put up any money; he suggested the sale of a corner parcel for use as a gas station to obtain $50,000 to be paid by the corporation to defendants as down payment for the property; that in their original negotiations they planned to obtain a C2 zoning so that one corner could be sold for a gasoline station; that when they modified their contract to substitute C1 zoning, no other arrangement for obtaining the $50,000 was devised; that it was understood before the contract was entered into that he would use his knowledge or

profession to locate financing; that "it was my obligation to try to secure the necessary financing to develop the property"; and he told defendants he thought he could raise the money to complete financing of the buildings.

Defendants orally agreed to this arrangement. Plaintiff interviewed numerous persons to promote the rezoning and development of the property. An application for rezoning to C1 classification was executed by defendants and on November 5, 1956, it was filed with the authorities. The written contract was subsequently executed on November 17, 1956.

Plaintiff procured a change of zoning to C1 classification on February 5, 1957, within the one-year period, subject to a bond in the amount of $18,686 required by the city to assure street improvements. His out-of-pocket expenditures totaled about $3,000. It was stipulated that no corporation was formed and no price was mutually agreed on for the sale of the property.

Plaintiff solicited construction loans from a number of sources but without success. He testified that a "tightening of the money market" prevented this and he never secured the financing to develop the property. Sale of the corner for use as a gasoline service station could not be accomplished because use for that purpose required a C2 zoning classification. Plaintiff attempted to negotiate a compromise under which he and defendants would agree to give up part of their shares in the corporation to be formed to third persons for financial assistance but defendants would not agree. Plaintiff testified defendants never told him they did not want to develop the property, and they never told him they would not sell the property at any price. In October 1957 plaintiff told defendants he had an offer of $150,000 for the property. He did not name the potential buyer nor present any written offer from the buyer. Defendants indicated to him they would not accept that amount in view of an earlier statement by him that the property was worth $200,000. He admitted making that statement and testified the value of the property as of November 17, 1957, was $200,000.

Whether the parties to a contract have thereby created, as between themselves, the relation of joint venturers or some other relation involving cooperative effort, depends upon their actual intention, which is determined in accordance with the ordinary rules governing the interpretation and construction of contracts. (*Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751, 764-765 [128 P.2d 665]; 28 Cal.Jur.

2d 484, § 6.) ■ Where the writing leaves in doubt the true intention of the parties, the court is justified in taking other evidence to aid in arriving at its meaning. (*Coley* v. *Wolcott*, 103 Cal.App. 140, 145-146 [284 P. 241].) ■ The question whether the relation of joint venturers was created was primarily a question for the trial court to determine from the facts and the inferences to be drawn therefrom. (*Spier* v. *Lang*, 4 Cal.2d 711, 716 [53 P.2d 138].) ■ A reasonable conclusion from a reading of the contract and the oral evidence is that plaintiff was acting as a real estate broker. The contract resulted from his efforts to solicit defendants' consent to various arrangements in respect to their real property in which he would represent them as a licensed real estate broker. ■ An agreement to "go into business" of itself does not imply a joint venture or any specific type of operation. (*Mindenberg* v. *Carmel Film Productions*, 132 Cal.App.2d 598, 601-602 [282 P.2d 1024].) The court heard the evidence and impliedly found there was not a joint venture. The implied finding is supported by the record.

Any contention that plaintiff had the rights of a joint venturer because no corporation was formed overlooks the findings of the trial court, sustained by substantial evidence, that plaintiff did not fully perform on his part and that defendants did not refuse to incorporate or to discuss the sale of the property. He assumes that by obtaining the rezoning of defendants' property to the C1 classification he has fully performed all the terms of the contract.

■ *Staples* v. *Leidecker*, 216 Cal. 604 [15 P.2d 514], is directly in point. In Staples the plaintiff claimed a joint venture and asked an accounting, alleging an agreement under which the defendant was to assign his patent rights for a paper dispenser to a corporation to be organized and cause the corporation to issue 49 per cent of its authorized capital stock to the plaintiff in consideration of the plaintiff's advancement of all funds necessary to finance the manufacturing and distribution of the dispensers. The plaintiff alleged he had advanced $4,820.48 for such purpose and had otherwise fully performed on his part but that the defendant refused to transfer his patent rights or to form the corporation and issue the stock. The defendant alleged that the plaintiff had agreed to manufacture and deliver 1,000 paper dispensers under the defendant's patent and provide the necessary dies for other dispensers before performance by the defendant.

The court stated (p. 606) :

"It has been the plaintiff's theory throughout that since the oral agreement looked to the formation of a corporation and provided for a division of its stock, any failure to consummate the same must necessarily result in a *quasi* partnership or joint venture arrangement calling for an accounting at the suit of either party to the contract. In support thereof he cites many authorities announcing the settled principle that when an agreement to form a corporation and divide its stock fails of consummation because of noncompliance with the statute or otherwise, equity in order to do justice will look through the veil and treat the relationship between the parties as one in the nature of *quasi* partnership or joint venture. We have no quarrel with the authorities stating this principle. They are inapplicable, however, to the facts of this case as found by the court below. The trial court found, in effect, that it was a condition precedent to the functioning of the proposed corporation or of any resulting joint venture, that plaintiff procure and deliver one thousand completed paper dispensers and the dies necessary to manufacture others, and that plaintiff's failure to perform his part of the contract was the sole and only reason for the inability of the parties to proceed as originally agreed. . . .

"Inasmuch as the plaintiff has failed, and through no fault of the defendant, to perform the obligations imposed upon him as a condition precedent to the defendant's performance under the contract, plaintiff is not in a position to charge the defendant with a breach thereof or to secure an accounting on the basis that the parties were engaged in a joint venture. In the absence of plaintiff's preliminary performance of the obligations imposed upon him, the relationship, which he seeks to establish necessarily could not arise under the terms of the contract as found by the trial court.''

■ In the case at bar the trial court found, in effect, that it was a condition precedent to the functioning of the proposed corporation or of any resulting joint venture, that plaintiff procure adequate financing for the development of the property and arrange the sale of the corner to obtain the essential funds to make the $50,000 down payment to defendants for conveyance of the property to the corporation. Plaintiff's failure to perform in this respect made it impossible for the parties to proceed as originally agreed. The findings are fully supported by the evidence.

Plaintiff contends in any event that he had a right under the alternative clause in the contract to have the property sold within the one-year period. The alternative clause was to become operative "in the event the parties deem it inadvisable" to develop the property. In order to invoke the optional provision to sell the property, it in effect required that all of the parties agree that it was inadvisable to develop the property. It appears plaintiff formed the opinion that it was inadvisable to develop the property but defendants were not of that opinion. The option to sell could not, under the terms of the contract, be exercised by plaintiff alone. Lacking proof of agreement, plaintiff could not show defendants in default under the alternative provision. As stated in *Ablett* v. *Clauson*, 43 Cal.2d 280 (p. 284) [272 P.2d 753]:

"The general rule regarding contracts to agree in the future is stated to be as follows: 'Although a promise may be sufficiently definite when it contains an option given to the promisor or promisee, yet if an essential element is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. Since either party by the terms of the promise may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise.' (1 Williston, Contracts (Rev. ed. 1936) 131, § 45.) The rule is well established in this state (*Autry* v. *Republic Productions, Inc., supra,* 30 Cal.2d 151 [180 P.2d 888]; *Vangel* v. *Vangel,* 116 Cal.App.2d 615, 631 [254 P.2d 919]; *Howard* v. *Burrow,* 77 Cal.App. 4, 8 [245 P. 808]), and, in conformity with the weight of authority in other states (see anno. 172 A.L.R. 421, et seq.), it has been held that an option agreement which leaves an essential term to future agreement is not enforceable."

Plaintiff argues that the facts bring the case within the more lenient rule which the courts have applied in limited situations involving lease-renewal covenants where the renewal-rental price was left to the future agreement of the parties. A basis for upholding option provisions which leave the amount of rent to future agreement is that the implied agreement of a reasonable rent, if the parties are unable to agree, provides a sufficient standard for enforcing the option without requiring the court to write a new contract for them. Where, as here, it is necessary that the parties reach agreement on more than one matter and in view of the construction of the contract as a contract of agency providing

324

compensation to the broker dependent on speculative contingencies, the trial court properly refused to write a new contract for them. In *Ablett* v. *Clauson, supra,* 43 Cal.2d 280, 286, the court indicated its disapproval of extending this exception to the rule.

Plaintiff further contends that if he cannot enforce the alternative provision which expressly limited the right of sale to the one-year period, then he still retains the right to participate in a corporation for the development of the property and that right should have been declared in his favor in the count for declaratory relief. The contract does not expressly limit the time in which financing and incorporation were to be accomplished. It does, however, clearly indicate that the provision to sell was an alternative to incorporation and states that the "right of sale" should extend only for the one-year period, i.e., until November 17, 1957. It follows that where the alternative provision is limited to the one-year period, the earlier provision must necessarily be foreclosed within that period. It was reasonable for the trial court to impliedly find from the language of the instrument and the conduct of the parties that it was contemplated that the entire contract would have no force and effect beyond one year from the date of its execution. It appears the true purpose of the parties in executing the contract was the exploitation of the property for commercial use. It appears it was their intent that plaintiff use the skill and knowledge as a broker to promote the project by obtaining a rezoning of the property, finding a purchaser for the corner parcel, and obtaining adequate financial assistance from outside sources, and that plaintiff's compensation be contingent on his successful promotion or, in the event the alternative clause became operative, on his obtaining a bona fide buyer. Since, as we have stated, it appears the trial court did not consider the alternative provision enforceable, we need not discuss plaintiff's duties in respect to the sale of the property. The evidence is sufficient to support the finding that plaintiff did not fully perform in that he failed to obtain adequate financial arrangements to carry out the plans for the development.

In *Hicks* v. *Post,* 154 Cal. 22 [96 P. 878], the situation was analogous. Hicks was a quiet title action brought by the owner of land against defendants who agreed to sink a well upon plaintiff's land, install a pumping plant, and pay all the expenses in connection with the development of the water and installation of the pumping plant, attend to details of sub-

dividing and selling the premises in tracts, and harvest any crops produced on the premises. The owner had agreed that the defendants should have the exclusive handling, subdividing and sale of the premises and that the net proceeds therefrom in excess of the sum of $125 per acre should be divided equally between plaintiff and defendants. The contract was to remain in effect for two years. The court held that the defendants had no legal or equitable interest in the land and that the contract was nothing more than an agreement of agency by which the plaintiff gave the defendants, in consideration of money to be expended and services to be performed by them, the exclusive right to sell the land for a compensation to be measured by the price realized. It did not give the defendants any interest in the land nor create a partnership or joint venture between the parties. The court said (p. 27):

"The agent, in the hope and belief that he will be able to sell the land at a profit within the time, agrees to and does make certain expenditures upon the land. If he is able to make the sales he will be reimbursed for these expenditures out of the proceeds of the sales. If he fails to make the sales he loses the expenditures which he has made. This is the element of chance which necessarily inheres in a contract of this character."

A broker has no right to reimbursement for expenses which he agrees to pay in consideration for an exclusive agency. (*Title Insurance & Trust Co.* v. *Grider*, 152 Cal. 746, 753 [94 P. 601, 13 L.R.A. N.S. 866].)

In the case at bar, the broker agreed to put his time and effort into the project and to make necessary expenditures for rezoning. If he had been able to promote the commercial development, he would have received compensation far greater than the value of his services and expenditures. He failed to carry out his purpose but he had the full benefit of the opportunity for which he bargained.

Affirmed.

Shinn, P. J., concurred.