[No. A081440. First Dist., Div. One. Aug. 20, 1999.]

PATRICIA HOLMES, Plaintiff and Respondent, v.
SANDRA KRUGER LERNER et al., Defendants and Appellants.

[No. A081435. First Dist., Div. One. Aug. 20, 1999.]

PATRICIA HOLMES, Plaintiff and Appellant, v.
SANDRA KRUGER LERNER et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III. through VIII.

## COUNSEL

Cotchett, Pitre & Simon, Frank M. Pitre, Nancy L. Fineman and Mark C. Molumphy for Plaintiff and Appellant and for Plaintiff and Respondent.

McCutchen, Doyle, Brown & Enersen, William Bates III, Geoffrey M. Howard and Russ K. Yoshinaka for Defendants and Appellants and for Defendants and Respondents.

## OPINION

**MARCHIANO, J.**—This case involves an oral partnership agreement to start a cosmetics company known as "Urban Decay." Patricia Holmes prevailed on her claim that Sandra Kruger Lerner breached her partnership agreement and that David Soward interfered with the Holmes-Lerner contract, resulting in Holmes's ouster from the business. Lerner and Soward appeal from the judgment finding them liable to Holmes for compensatory and punitive damages of over $1 million. Holmes appeals from the portion

of the judgment imposing joint and several liability for the award of compensatory damages, and the court's order granting a nonsuit on various causes of action against Soward.

We affirm the judgment against Lerner, primarily because we determine that an express agreement to divide profits is not a prerequisite to prove the existence of a partnership. We also determine that the oral partnership agreement between Lerner and Holmes was sufficiently definite to allow enforcement. We reverse the judgment as to Soward because the finding that he interfered with the contract between Holmes and Lerner is precluded by the jury's express finding that Lerner never intended to perform the contract. We also reverse an order granting a nonsuit on claims against Soward for aiding and abetting and conspiracy related to fraud, breach of fiduciary duty, and constructive fraud. We affirm the trial court's determination that the damages awarded were joint and several, because, although based on different theories and breach of obligations, only a single item of damages was sought and proven.

## BACKGROUND

When we review a jury verdict, we apply the substantial evidence standard of review. All conflicts in the evidence are resolved in favor of the prevailing party, and all reasonable inferences are drawn in a manner that upholds the verdict. (*Greathouse* v. *Amcord, Inc.* (1995) 35 Cal.App.4th 831, 836-837 [41 Cal.Rptr.2d 561], citing *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) The parties agree that in this case of sharply conflicting evidence, all conflicting evidence and reasonable inferences supporting Holmes's version of the facts are to be accepted as true. Because the existence of a partnership requires a fact-intensive analysis in this case, we detail the following facts presented at trial.

Sandra Lerner is a successful entrepreneur and an experienced business person. She and her husband were the original founders of Cisco Systems. When she sold her interest in that company, she received a substantial amount of money, which she invested, in part, in a venture capital limited partnership called "& Capital Partners." By the time of trial in this matter, Lerner was extremely wealthy. Patricia Holmes met Lerner in late 1993, when Lerner visited Holmes's horse training facility to arrange for training and boarding of two horses that Lerner was importing from England. Holmes and Lerner became friends, and after an initial six-month training contract expired, Holmes continued to train Lerner's horses without a contract and without cost.

In 1995, Lerner and Holmes traveled to England to a horse show and to make arrangements to ship the horses that Lerner had purchased. On this

trip, Lerner decided that she wanted to celebrate her 40th birthday by going pub crawling in Dublin. Lerner was wearing what Holmes termed "alterna- tive clothes" and black nail polish, and encouraged Holmes to do the same.[1] Holmes, however, did not like black nail polish, and was unable to find a suitable color in the English stores. At Lerner's mansion outside of London, Lerner gave Holmes a manicuring kit, telling her to see if she could find a color she would wear. Holmes looked through the kit, tried different colors, and eventually developed her own color by layering a raspberry color over black nail polish. This produced a purple color that Holmes liked. Holmes showed the new color to Lerner, who also liked it.

On July 31, 1995, the two women returned from England and stayed at Lerner's West Hollywood condominium while they waited for the horses to clear quarantine. While sitting at the kitchen table, they discussed nail polish, and colors. Len Bosack, Lerner's husband, was in and out of the room during the conversations. For approximately an hour and a half, Lerner and Holmes worked with the colors in a nail kit to try to recreate the purple color Holmes had made in England so they could have the color in a liquid form, rather than layering two colors. Lerner made a different shade of purple, and Holmes commented that it looked just like a bruise. Holmes then said that she wanted to call the purple color she had made "Plague." Holmes had been reading about 16th-century England, and how people with the plague developed purple sores, and she thought the color looked like the plague sores.[2] Lerner and Holmes discussed the fact that the names they were creating had an urban theme, and tried to think of other names to fit the theme. Starting with "Bruise" and "Plague," they also discussed the names "Mildew," "Smog," "Uzi," and "Oil Slick." Len Bosack walked into the kitchen at that point, heard the conversation about the urban theme, and said "What about decay?" The two women liked the idea, and decided that "Urban Decay" was a good name for their concept.[3]

Lerner said to Holmes: "This seems like a good [thing], it's something that we both like, and isn't out there. Do you think we should start a company?" Holmes responded: "Yes, I think it's a great idea." Lerner told Holmes that they would have to do market research and determine how to have the polishes produced, and that there were many things they would

[1]There were references throughout the trial to Lerner's "alternative" look and to "alterna- tive" culture. Lerner, who referred to herself as an "edgy cosmetics queen," described "alternative culture" as "not really mainstream," "edgy," and "fashion forward." As an example, she noted her own purple hair. She defined "edgy" as not trying to be cute, and being unconventional.

[2]Plague is described as "rich violet with a blue sheen."

[3]At the trial, Lerner testified that she had an idea prior to July of 1995 that there might be a market for unusual nail colors, but was missing a "unifying theme" to identify the concept.

have to do. Lerner said: "We will hire people to work for us. We will do everything we can to get the company going, and then we'll be creative, and other people will do the work, so we'll have time to continue riding the horses." Holmes agreed that they would do those things. They did not separate out which tasks each of them would do, but planned to do it all together.

Lerner went to the telephone and called David Soward, the general partner of & Capital, and her business consultant. Holmes heard her say "Please check Urban, for the name, Urban Decay, to see if it's available and if it is, get it for us." Holmes knew that Lerner did not joke about business, and was certain, from the tone of her voice, that Lerner was serious about the new business. The telephone call to secure the trademark for Urban Decay confirmed in Holmes's mind that they were forming a business based on the concepts they had originated in England and at the kitchen table that day. Holmes knew that she would be taking the risk of sharing in losses as well as potential success, but the two friends did not discuss the details at that time. Lerner's housekeeper heard Lerner tell Holmes: "It's going to be our baby, and we're going to work on it together." After Holmes left, the housekeeper asked what gave Lerner the idea to go into the cosmetics business, since her background was computers. Lerner replied: "It was all Pat's idea over in England, but I've got the money to make it work." Lerner told her housekeeper that she hoped to sell Urban Decay to Estee Lauder for $50 million.

Although neither of the two women had any experience in the cosmetics business, they began work on their idea immediately. Holmes and Lerner did market research by going to stores, talking with people about nail polish, seeing what nail polishes were available, and buying samples to bring back to discuss with each other. They met frequently in August and September at Lerner's home, and experimented with nail colors. They took pictures of various color mixing sessions. In early August, they met with a graphic artist, Andrea Kelly, and discussed putting together a logo and future advertising work for Urban Decay.

Prior to the first scheduled August meeting, Holmes told Lerner she was concerned about financing the venture. Lerner told her not to worry about it because Lerner thought they could convince Soward that the nail polish business would be a good investment. She told Holmes that Soward took care of Lerner's investment money. Holmes and Lerner discussed their plans for the company, and agreed that they would attempt to build it up and then sell it. Lerner and Holmes discussed the need to visit chemical companies and hire people to handle the daily operations of the company. However, the creative aspect, ideas, inspiration, and impetus for the company came from Holmes and Lerner.

Lerner, Holmes, Soward, and Kelly attended the first scheduled meeting. The participants in these meetings referred to them as "board meetings," even though there was no formal organizational structure, and technically, no board. They discussed financing, and Soward reluctantly agreed to commit $500,000 towards the project. Urban Decay was financed entirely by & Capital, the venture capital partnership composed of Soward as general partner, and Lerner and her husband as the only limited partners. Neither Lerner nor Holmes invested any of their individual funds.

Lerner and Soward went to Kirker Chemical Company later in August of 1995 and learned about mixing and manufacturing nail polish colors. Lerner discouraged Holmes from accompanying them. Although Lerner returned to Kirker, she never took Holmes with her. At the second board meeting, in late August, Soward introduced Wendy Zomnir, a friend of Soward's former fiancée, as an advertising and marketing specialist. After Zomnir and Kelly left the meeting, Holmes, Lerner and Soward discussed her presentation. Holmes was enthusiastic about Zomnir and they decided to hire her. At the conclusion of the September board meeting, after Holmes had left, Lerner and Soward secretly made Zomnir an offer of employment, which included a percentage ownership interest in Urban Decay. It wasn't until a couple of meetings later, when Lerner or Soward referred to Zomnir as the "Chief Operating Officer" of Urban Decay, that Holmes learned of the terms of the offer.

In early October, after Holmes learned of the secret offer to Zomnir, she asked Lerner to define her role at Urban Decay. Lerner responded: "Your role is anything you want it to be." When Holmes asked to discuss the issue in more detail, Lerner turned and walked away. Holmes believed that Lerner was nervous about an upcoming photo session, and decided to discuss it with Lerner at a later date. At their regular board meetings, Holmes participated with Soward, Lerner, Zomnir, Kelly and another person in discussing new colors, and deciding which ones they wanted to sell, and which names would be used.

In September of 1995, Soward signed an application for trademark registration as president of Urban Decay. In December of 1995, Urban Decay was incorporated. Holmes asked for a copy of the articles of incorporation, but was given only two pages showing the name and address of the company. On December 31, Holmes sent a fax to Lerner stating that it had been difficult to discuss her position in Urban Decay with Lerner. Holmes asked Lerner: "What are my responsibilities and obligations, and what are my rights or entitlements?" Holmes also asked: "What are my current and potential liabilities and assets?" She requested that Lerner provide the

information in writing. At this point, Holmes wanted to memorialize the agreement she and Lerner had made on July 31.

Soward intercepted the fax and called Holmes, asking: "What's going on?" Holmes explained that she wanted a written agreement, and Soward apologized, telling her that Lerner had asked him to get "something . . . in writing" to Holmes. Soward told Holmes that no one in the company had a written statement of their percentage interest in the company yet. Soward asked: "What do you want, one percent, two percent?" When Holmes did not respond, he told her that 5 percent was high for an idea. Holmes told him: "I'm not selling an idea. I'm a founder of this company." Soward exclaimed: "Surely you don't think you have fifty percent of this company?" Holmes told him that it was a matter between herself and Lerner, and that Soward should speak to Lerner. Soward agreed to talk to Lerner.

On January 11, 1996, Lerner and Holmes met at a coffee shop to discuss the fax. Holmes explained that she wanted "something in writing" and an explanation of her interest and position in the company. Lerner responded that a start-up business is "like a freight train . . . you can either run and catch up, and get on, and take a piece of this company and make it your own, or get out of the way." As a result of this conversation, Holmes decided to double her efforts on behalf of Urban Decay. Because she was most comfortable working at the warehouse, she focused on that aspect of the business.[4] Holmes was reimbursed for mileage, but received no pay for her work.

During January and February, Urban Decay was launching its new nail polish product. Publicity included press releases, brochures, and newspaper interviews with Lerner. An early press release stated: "The idea for Urban Decay was born after Lerner and her horse trainer, Pat Holmes, were sitting around in the English countryside." Lerner approved the press release. In February of 1996, an article was printed in the San Francisco Examiner containing the following quotes from Lerner. "Since we couldn't find good nail polish, in cool colors there must be a business opportunity here. Pat had the original idea. Urban Decay was my spin." The Examiner reporter testified at trial that the quote attributed to Lerner was accurate. Lerner was

[4]Holmes testified that her work at the warehouse included responding to requests for brochures, developing a system for handling increased telephone inquiries, and negotiating a contract with a skills center to assist with the mail order business. She had authority to hire and fire employees and to sign checks on the Urban Decay account. Only Holmes, Soward, Lerner, Zomnir and the warehouse manager were authorized to sign on the account. Only the manager's authority was limited to $1,500. Holmes was spending four to five days a week at the warehouse. Urban Decay accountant Sharon Land testified that Holmes "contributed a great deal" to Urban Decay and directed the retail business. Soward, Lerner and Zomnir seldom came to the office. Soward told Land that Holmes was on the board of directors.

also interviewed in April by CNN. In that interview she told the story of herself and Holmes looking for unusual colors, mixing their own colors at the kitchen table, and that "we came up with the colors, and it just sort of suggested the urban thing."[5]

Lerner had always notified Holmes whenever there was a board meeting, and she sent Holmes an agenda for the February 20, 1996, meeting. Lerner also sent a memo stating that she thought they should have an "operations meeting" with the warehouse supervisor first.[6] Lerner's memo continued: "and then have a regular board meeting, including [Zomnir], me, David, and Pat, and no one else." Holmes understood that the regular board meeting would be for the purpose of discussing general Urban Decay business. At the operations meeting, Holmes made a presentation regarding the warehouse operations. The financial report showed $205,000 in revenues and $431,000 in expenses.[7] The "directors" thought this early sales figure was "terrific." Soward handed out an organizational chart, which showed Lerner, with the title "CEO" at the top; Soward, as "President" beneath her; and Zomnir, as "COO" beneath Soward. Holmes asked "Where am I?" Lerner responded by pointing to the top of the chart and telling Holmes that she was a director, and was at the top of the chart, above all the other names.[8]

In March of 1996, Holmes received a document from Soward offering her a 1 percent ownership interest in Urban Decay. Soward explained that Urban Decay had been formed as a limited liability company, which was owned by its members.[9] For the first time, Holmes realized that Lerner and Soward had produced an organizational document that did not include her, and she was now being asked to become a minor partner. When she studied the document, she discovered that it referred to an exhibit A, which was purported to show the distribution of ownership interests in Urban Decay.

---

[5]When asked at trial why she used the word "we," Lerner responded that she was stressed. Lerner testified that almost every statement she made in the CNN interview was false and a result of stress.

[6]The parties were able to reconstruct the time of various meetings through the use of memos and their personal calendars. Lerner, however, who testified that she had a bad memory in general, had destroyed her calendars from 1995 for every month except December.

[7]Urban Decay was involved in a lawsuit with Revlon, over Revlon's use of similar colors and names for its new line of "Streetwear" nail colors. Lerner believed that Revlon's actions had potentially impacted sales.

[8]An organization chart which was presented at a board meeting in June of 1996 showed a box labeled "Board of Directors" at the top, and did not specifically name Lerner or Holmes.

[9]"A limited liability company is a hybrid business entity that combines aspects of both a partnership and a corporation. It is formed under the Corporations Code and consists of 'members' who own membership interests." (9 Witkin, Summary of Cal. Law (9th ed. 1999 Supp.) Partnership, § 120, p. 245.)

Soward had given Zomnir a copy of exhibit A when he offered her an ownership interest in Urban Decay. However, when Holmes asked Soward for a copy of exhibit A, he told her it did not exist.[10] By this time, Holmes was planning to consult an attorney about the document.

Despite the deterioration of her friendship with Lerner, and her strained relationship with Soward, Holmes continued to attend the scheduled board meetings, hoping that her differences with Lerner could be resolved. She also continued to work at the warehouse on various administrative projects and on direct mail order sales. As late as the April board meeting, Holmes was still actively engaged in Urban Decay business. She made a presentation on a direct mail project she had been asked to undertake. As a result of Holmes's attendance at a sales presentation when she referred to herself as a cofounder of Urban Decay, Lerner instructed Zomnir to draft a dress code and an official history of Urban Decay. Lerner told Zomnir that it was a "real error in judgment" to allow Holmes to attend the sales presentation because she did not project the appropriate image. The official history, proposed in the memo, omitted any reference to Holmes. Finally, matters deteriorated to the point that Soward told Holmes not to attend the July board meeting because she was no longer welcome at Urban Decay.

On August 27, 1996, Holmes filed a complaint against Lerner and Soward, alleging 10 causes of action, including breach of an oral contract, intentional interference with contractual relations, fraud, breach of fiduciary duty, and constructive fraud. Holmes eventually dismissed some of her claims and the court dismissed others, sending the case to the jury on the causes of action noted above. At the trial, cosmetics industry expert Gabriella Zuckerman testified that Urban Decay was not just a fad. In her opinion, Urban Decay had discovered and capitalized on a trend that was just beginning. She reviewed projected sales figures of $19.9 million in 1997, going up to $52 million in 2003, and found them definitely obtainable. Arthur Clark, Holmes's expert at valuing start-up businesses, valued Urban Decay under different risk scenarios. In Clark's opinion, the value of Urban Decay to a potential buyer was between $4,672,000 and $6,270,000. Lerner's expert, who had never valued a cosmetics company, testified that Urban Decay had $2.7 million in sales in 1996. He estimated the value of Urban

---

[10]Holmes was never given exhibit A, and did not see it until trial. It showed & Capital Partners, L.P. with a 92 percent interest, having contributed $489,900. It also showed Lerner and her husband with contributions of $5,050 each, and 1 percent apiece. Zomnir's contribution was listed as $5,050, but she had a 5 percent interest. None of the individuals actually paid in the listed contributions.

Decay as approximately \$2 million, but concluded that it was not marketable.[11]

Lerner and Soward claimed that Holmes was never a director, officer, or even an employee of Urban Decay. According to Lerner, she was just being nice to Holmes by letting her be present during Urban Decay business. Lerner denied Holmes had any role in creating the colors, names, or concepts for Urban Decay. When Holmes asked Lerner about her assets and liabilities in Urban Decay, Lerner thought she was asking for a job. She explained her statements to the press regarding Urban Decay being Holmes's idea as misquotes or the product of her stress.

The jury found in favor of Holmes on every cause of action. The jury assessed \$480,000 in damages against Lerner, and \$320,000 against Soward. Following presentation of evidence as to net worth, the jury awarded punitive damages of \$500,000 against Lerner and \$130,000 against Soward. In the judgment, the court declined to add the two amounts together, but stated that the verdict of \$320,000 was against Lerner and Soward, jointly and severally, and that the additional \$160,000 verdict was against Lerner individually. Lerner and Soward moved for a judgment notwithstanding the verdict, which was denied on December 16, 1997. They appealed, in No. A081440, from the judgment and the order denying their postverdict motion. Holmes appealed in No. A081435, from that portion of the judgment finding that Lerner and Soward are jointly and severally liable for the \$320,000 award, and the court's granting of Lerner and Soward's motion for nonsuit on various causes of action. We have consolidated the two appeals for purposes of oral argument and decision.

## DISCUSSION

### The Appeal in No. A081440 — Lerner and Soward

Lerner and Soward argue that there was no partnership agreement as a matter of law, that the evidence was insufficient to support the fraud judgment against Lerner, that damages were incorrectly calculated, that the evidence does not support the judgment against Soward and that the judgment for punitive damages must be reversed. In the consolidated appeal, Holmes argues that the trial court erred in granting a nonsuit on various causes of action and in awarding a lesser amount of damages than was reflected in the jury verdict. We address these contentions in the order presented by the parties.

---

[11]Soward testified that & Capital had invested a total of \$2 million in Urban Decay by the time of trial. The investment at the time of the breach of contract was just under \$800,000.

I. *There Was No Error in the Determination That a Partnership Was Formed*

 Holmes testified that she and Lerner did not discuss sharing profits of the business during the July 31, "kitchen table" conversation. Throughout the case, Lerner and Soward have contended that without an agreement to share profits, there can be no partnership. Lerner and Soward begin their argument on appeal by quoting a statement from *Westcott* v. *Gilman* (1915) 170 Cal. 562, 568 [150 P. 777], that profit sharing is "an essential element of every partnership . . . ." They argue that nothing has changed since the "ancient truth" regarding profit sharing was expressed in *Westcott*. However, an important element supporting the *Westcott* decision has changed, because *Westcott* relied on the language of former section 2395 of the Civil Code. (170 Cal. at p. 569.) That statutory predecessor of the Uniform Partnership Act (UPA, Corp. Code § 16100 et seq.) defined a partnership as: " ' ". . . the association of two or more persons, for the purpose of carrying on business together, *and dividing its profits between them*." ' " (*Black* v. *Brundige* (1932) 125 Cal.App. 641, 645, [13 P.2d 999], italics added.) Civil Code former section 2395 was repealed and replaced with the UPA in 1949. (125 Cal-.App. at p. 645.)

The applicable version of the UPA, located at Corporations Code former section 15001 et seq., omitted the language regarding division of profits and defined a partnership as: "an association of two or more persons to carry on as coowners a business for profit." (former § 15006.)[12] When the Legislature enacts a new statute, replacing an existing one, and omits express language, it indicates an intent to change the original act. (*Dubins* v. *Regents of University of California* (1994) 25 Cal.App.4th 77, 85 [30 Cal.Rptr.2d 336].) We can only conclude that the omission of the language regarding dividing profits from the definition of a partnership was an intentional change in the law.[13] The UPA relocated the provision regarding profits to former section 15007, subdivision (4), which provided that in determining whether a partnership exists, "[t]he receipt by a person of a share of the profits of a business is primà facie evidence that he is a partner . . . ." This relocation of the element of sharing the profits indicates that the Legislature intends

---

[12]Unless otherwise indicated, all statutory references are to the Corporations Code. The provisions of former section 15001 et seq., were repealed and replaced with the UPA of 1994 (§ 16100 et seq.), which is applicable to partnerships formed on or after January 1, 1999. (§ 16111.)

[13](The significance of the change in the definition of a partnership is noted in the article by Professor Wright, *California Partnership Law and the Uniform Partnership Act* (1921) 9 Cal.L.Rev. 117, 127-128, criticizing the Civil Code provision because it "emphasizes the division of profits unduly," and noting that deletion of the " 'dividing the profit between them' " language of the Civil Code would theoretically allow a partnership to be formed in which all profits went to one partner, or all profits were reinvested.)

profit sharing to be evidence of a partnership, rather than a required element of the definition of a partnership.[14] (See, e.g., *Auditorium Co.* v. *Barsotti* (1919) 40 Cal.App. 592, 596 [181 P. 413] [the distinguishing feature of partnership is association to carry on business together, not agreement to share profits]; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 764 [128 P.2d 665] [mode of participating in profits may be left to the agreement of the parties].) The presence or absence of any of the various elements set forth in former section 15007, including sharing of profits and losses, is not necessarily dispositive. As explained in *Cochran* v. *Board of Supervisors* (1978) 85 Cal.App.3d 75, 80 [149 Cal.Rptr. 304], the rules to establish the existence of a partnership in former section 15007 should be viewed in the light of the crucial factor of the intent of the parties revealed in the terms of their agreement, conduct, and the surrounding circumstances when determining whether a partnership exists.

The UPA provides for the situation in which the partners have not expressly stated an agreement regarding sharing of profits. Former section 15018 provided in relevant part: "The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules: [¶] (a) Each partner shall . . . share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied." This provision states, subject to an agreement between the parties, partners "shall" share equally in the profits. Lerner and Soward argue that using former section 15018 to supply a missing term regarding profit sharing ignores the provision of former section 15007, subdivision (2). That section, headed "rules for determining existence of partnership," provided that mere joint ownership of common property "does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property." Lerner and Soward are mistaken. The definition in former section 15006 provides that the association with the intent to carry on a business for profit is the essential requirement for a partnership.[15] Following that definition does not transform mere joint ownership into the essence of a partnership.

---

[14]Under the provisions of the UPA of 1994, effective, January 1, 1999, the sharing of profits is recharacterized as an evidentiary presumption, rather than prima facie evidence. (§ 16202, subd. (c)(3).)

[15]Contrary to Lerner and Soward's contention, *Myers* v. *Gager* (1959) 175 Cal.App.2d 314 [346 P.2d 251] is not dispositive. Lerner and Soward quote a sentence out of context to the effect that an agreement to "go into business" does not establish a partnership. The agreement in *Myers* was an agreement to sell real property between a property owner and a real estate broker, and was never intended to be a partnership. The "go into business" quotation was from *Mindenberg* v. *Carmel Film Productions* (1955) 132 Cal.App.2d 598, 601-602 [282 P.2d 1024], which involved an express agreement to go into business as a corporation. The court rejected an argument that the statement that the parties "agreed to go into business" somehow implied a joint venture. Neither case is applicable here.

The cases relied upon by Lerner and Soward do not compel a different conclusion. *Cislaw* v. *Southland Corp.* (1992) 4 Cal.App.4th 1284 [6 Cal.Rptr.2d 386] and *Holtz* v. *United Plumbing & Heating Co.* (1957) 49 Cal.2d 501 [319 P.2d 617], are wrongful death cases, in which plaintiffs sought to impose liability on a third party on the theory of membership in a joint venture with the wrongdoer. Dicta in *Cislaw* stated that " 'the essential elements of both a joint venture and partnership are a sharing of profits as well as losses . . . .' " (*Cislaw* v. *Southland Corp., supra,* 4 Cal.App.4th at p. 1297.) The court in *Holtz* stated that: "It has generally been recognized that in order to create a joint venture there must be an agreement between the parties under which they have . . . an understanding as to the sharing of profits and losses, and a right of joint control." (49 Cal.2d at pp. 506-507.) The *Holtz* court also explained that the agreement did not have to be "definite in every detail" but that terms could be implied from the acts of the parties. (*Id.* at p. 507.) We do not find the tort cases persuasive. It may be a fair policy to require a defendant to have a specified share in the benefits of a venture before imposing tort liability based solely on participation in the venture. Nevertheless, the policy emphasizing sharing in the profits is not compelling in the business context of determining whether parties have orally contracted to do business as partners.

*Cislaw* cited *People* v. *Park* (1978) 87 Cal.App.3d 550, 564 [151 Cal.Rptr. 146] in support of the statement regarding profits. *Park* was a criminal prosecution for sale of unregistered securities in which the defendant misappropriated the investor's funds. (*Id.* at pp. 563-564.) In dicta, the court addressed the defendant's claim that his victims were actually his partners or joint venturers. The court found that there was "not a shred of evidence" of any of the indicia of a partnership or joint venture. (*Id.* at p. 564.) It stated that the "essential elements" of a joint venture or partnership included "a sharing of profits." (*Ibid.*) It then incorrectly concluded that although the victims had agreed to share the profits from the investments, their failure to expressly make provision for distribution of losses was fatal to the claim of a partnership. (*Ibid.*; *April Enterprises, Inc.* v. *KTTV* (1983) 147 Cal.App.3d 805, 819 [195 Cal.Rptr. 421] [intention to share losses inferred from provision to share profits].) The real deficiency of the ill-fated defense in *Park* was the absence of evidence that the defendant's victims intended to carry on a business with him as co-owners. Like the tort cases, *Park* is not persuasive in this case.

Aside from the cases relied on by Lerner and Soward which involve attempts to impose tort liability on alleged joint venturers, two more recent cases that arise in a business context are also dependent on the joint venture theory, and do not discuss the provisions of the UPA. *April Enterprises, Inc.*

v. *KTTV, supra,* 147 Cal.App.3d 805, involved the liability of a television station for erasing videotapes, in violation of the plaintiff's contractual syndication rights. The court, relying on a medical malpractice case and *Holtz* v. *United Plumbing & Heating Co., supra,* 49 Cal.2d 501, stated that an understanding regarding sharing of profits and losses was one element necessary for the creation of a joint venture. (*April Enterprises, Inc.* v. *KTTV, supra,* 147 Cal.App.3d 805, 819.) Similarly, in *580 Folsom Associates* v. *Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 15-16 [272 Cal.Rptr. 227], the court quoted the definition of a joint venture from *April Enterprises,* which had been agreed to by the parties. These cases are not based on the UPA, do not discuss the statutory definitions, and are not, therefore, authority for Lerner and Soward's interpretation of the definitional statute.[16]

Two of the cases relied on in *Park* were partnership cases that actually characterized the sharing of profits as evidence, rather than as a required element of a partnership. The court in *Kersch* v. *Taber* (1945) 67 Cal.App.2d 499, 504 [154 P.2d 934], relying on the same definition of partnership as is applicable in this case, stated: "Ordinarily the existence of a partnership is evidenced by the right of the respective parties to participate in profits and losses and in the management and control of the business." The court concluded that none of the indicia of a partnership were present in that case. In *Constans* v. *Ross* (1951) 106 Cal.App.2d 381, 386 [235 P.2d 113] the court cited the same definition, and stated: "Ordinarily the existence of a partnership is evidenced by the right of the respective parties to participate in the profits and losses and in the management of the business."[17] Both cases refer to profit sharing as evidence. Neither case holds that profit sharing is an indispensable element of a partnership.

---

[16]*Sandberg* v. *Jacobson* (1967) 253 Cal.App.2d 663 [61 Cal.Rptr. 436], also cited by Lerner and Soward, inexplicably ignores the statutory definition of a partnership, and cites section 15018 as authority that an agreement to share in the profits and losses is essential to the existence of a partnership. Former section 15018 concerned the rights and duties of partners and provided that in the absence of an agreement, partners share the profits equally. *Sandberg* upheld a lower court's determination that the failure to spell out a computable measure of profit sharing was fatal to a claim of partnership, in a case which appeared to involve mere joint ownership of property. (253 Cal.App.2d at p. 669.) Although the result in *Sandberg* appears correct, we disagree with its definition of a partnership.

[17]*Constans* and *Kersch* rely on *Black* v. *Brundige, supra,* 125 Cal.App. 641 and *Martin* v. *Sharp & Fellows C. Co.* (1917) 34 Cal.App. 584 [168 P. 373], the latter being a pre-UPA case. Both of those cases contain language to the effect that jointly carrying on a business, and not profit sharing, is the true test of partnership. When the authorities underlying the cases cited by appellant are analyzed, they often can be traced back to the pre-UPA cases, in which profit sharing was specified in the statute as part of the definition of a partnership. Even in some of those cases, courts recognized that profit sharing is only one indicia of the existence of a partnership. (34 Cal.App. 584, and cases cited therein.)

The trial court in this case refused to add additional elements to the statutory definition and properly instructed the jury in the language of former section 15006. We agree with the trial court's interpretation of the law. The actual sharing of profits (with exceptions which do not apply here) is prima facie evidence, which is to be considered, in light of any other evidence, when determining if a partnership exists. (Former § 15007, subd. (4).) In this case, there were no profits to share at the time Holmes was expelled from the business, so the evidentiary provision of former section 15007, subdivision (4) is not applicable. According to former section 15006, parties who expressly agree to associate as co-owners with the intent to carry on a business for profit, have established a partnership. Once the elements of that definition are established, other provisions of the UPA and the conduct of the parties supply the details of the agreement.[18] Certainly implicit in the Holmes-Lerner agreement to operate Urban Decay together was an understanding to share in profits and losses as any business owners would. The evidence supported the jury's implicit finding that Holmes birthed an idea which was incubated jointly by Lerner and Holmes, from which they intended to profit once it was fully matured in their company.

## II. *The Agreement Was Sufficiently Definite*

Lerner and Soward argue that the agreement between Lerner and Holmes was too indefinite to be enforced. The cases they rely on do not support the argument. For example, in *Weddington Productions, Inc.* v. *Flick* (1998) 60 Cal.App.4th 793 [71 Cal.Rptr.2d 265], the court reversed an order enforcing a settlement agreement imposed by a mediator against the will of one of the parties. The issue was the lack of a meeting of the minds as to settlement. The court described the degree of certainty that is necessary to enforce a contract. "The parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense.' (Civ. Code, § 1580.) If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation. (Civ. Code, §§ 1550, 1565 & 1580.)" (60 Cal.App.4th at p. 811.) " ' "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." ' [Citation.]" (*Ibid.*) The evidence produced at trial in this case supplied the requisite degree of certainty described in *Weddington*.

In *Rochlis* v. *Walt Disney Co.* (1993) 19 Cal.App.4th 201 [23 Cal.Rptr.2d 793], disapproved on other grounds in *Turner* v. *Anheuser-Busch, Inc.* (1994)

---

[18]"The parties [to a partnership] need only possess the general intent to engage in the acts that constitute a partnership rather than the specific intent to be partners . . . . [Under the UPA] Parties who act as partners in conducting their business will likely be treated as partners for legal purposes." (Selecting & Forming Business Entities (Cont.Ed.Bar 1998) § 6.2, p. 137.)

7 Cal.4th 1238, 1251 [32 Cal.Rptr.2d 223, 876 P.2d 1022], a former employee was attempting to enforce various vague promises made during negotiations with the employer. The court merely stated that commitments such as: "promises to pay salary increases or bonuses which are 'appropriate' to [plaintiff's] responsibilities and performance . . ." are not sufficiently certain to be enforced in a court of law. (19 Cal.App.4th at pp. 213-214.) *Western Homes* v. *Herbert Ketell, Inc.* (1965) 236 Cal.App.2d 142 [45 Cal.Rptr. 856] is similar. In that case plaintiff sought enforcement of a promise that the parties "contemplate" that plaintiff would handle "leasing, rental collection and management of the entire project." (*Id.* at p. 144.) The court held that absent any terms to show certainty of agreement, the word "contemplate" indicated only an expectation. Unlike the parties in the foregoing cases, Holmes produced substantial evidence of an agreement as well as evidence of actions of the parties in conformance with their agreement.

"Parties are far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it." (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.*, *supra*, 20 Cal.2d 751, 762.) "There is no requirement, the intention to form a joint venture being otherwise present, that the parties must agree upon the post-acquisition management and operation of the property." (*Franco Western Oil Co.* v. *Fariss* (1968) 259 Cal.App.2d 325, 344-345 [66 Cal.Rptr. 458].) In addition, there is nothing unusual about a partnership in which one party supplies an idea which the other party brings into a substantive form. "Many businesses and great industrial organizations have sprouted from the germ of an idea in the mind of some man. When the idea is reduced to concrete form and put into action in the form of a business enterprise, an invention, a book, an opera or a theatrical production, the results of the idea are subject to private ownership." (*Lyon* v. *MacQuarrie* (1941) 46 Cal.App.2d 119, 125 [115 P.2d 594], disapproved on other grounds in *Weiner* v. *Fleischman* (1991) 54 Cal.3d 476, 485-486 [286 Cal.Rptr. 40, 816 P.2d 892].)

The agreement between Holmes and Lerner was to take Holmes's idea and reduce it to concrete form. They decided to do it together, to form a company, to hire employees, and to engage in the entire process together. The agreement here, as presented to the jury, was that Holmes and Lerner would start a cosmetics company based on the unusual colors developed by Holmes, identified by the urban theme and the exotic names. The agreement is evidenced by Lerner's statements: "We will do . . . everything," "[i]t's

going to be our baby, and we're going to work on it together." Their agreement is reflected in Lerner's words: "We will hire people to work for us." "We will do . . . everything we can to get the company going, and then we'll be creative, and other people will do the work, so we'll have time to continue riding the horses." The additional terms were filled in as the two women immediately began work on the multitude of details necessary to bring their idea to fruition. The fact that Holmes worked for almost a year, without expectation of pay, is further confirmation of the agreement. Lerner and Soward never objected to her work, her participation in board meetings and decisionmaking, or her exercise of authority over the retail warehouse operation. Even as late as the trial in this matter, when Lerner was claiming that everything Holmes said was a lie, Lerner admitted: "It was not only my intention to give Pat every opportunity to be a part of this, but I had hoped that she would." In the words of the court in *Weddington*, the parties agreed on the " 'same thing in the same sense.' " (*Weddington Productions, Inc.* v. *Flick, supra,* 60 Cal.App.4th at p. 811.) Holmes was not seeking specific enforcement of a single vague term of the agreement. She was frozen out of the business altogether, and her agreement with Lerner was completely renounced. The agreement that was made and the subsequent acts of the parties supply sufficient certainty to determine the existence of a breach and a remedy.[19]

As the court stated in *Lyon* v. *MacQuarrie, supra,* 46 Cal.App.2d 119, 126: ". . . the evidence is flatly and irreconcilably conflicting. A finding that no partnership had been formed, had one been made, would have had considerable evidentiary support. As the finding which was made of the formation and the existence of the partnership has ample support in evidence which was accepted by the trial judge as substantial and which was taken as true by him, we cannot disturb the judgment here."

III.-VIII.*

. . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment against Soward for interference with contract is reversed. The order granting a nonsuit to Soward on Holmes's aiding and abetting and

---

[19]Our determination that the judgment on the partnership issue may be affirmed disposes of Lerner and Soward's contentions regarding the breach of fiduciary duty and constructive fraud claims, which were based solely on the absence of a partnership.

*See footnote, *ante*, page 442.

civil conspiracy causes of action relating to fraud, breach of fiduciary duty and constructive fraud is reversed. In all other respects, the judgment and postjudgment order are affirmed. The parties are to bear their own costs on appeal.

Strankman, P. J., and Stein, J., concurred.

Petitions for a rehearing were denied September 7, 1999, and the opinion was modified to read as printed above.