Filed 9/17/14  Watkins v. Central Freight Lines CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DAVID WATKINS,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CENTRAL FREIGHT LINES, INC.,<br><br>        Defendant and Appellant. | A138015<br><br>(Alameda County<br>Super. Ct. No. RG 11-573600) |

Plaintiff David Watkins sued his former employer, defendant Central Freight Lines, Inc. (Central Freight), alleging his unfavorable work assignments and ultimate termination were motivated by racial discrimination and Central Freight's failure to rehire him occurred in retaliation for his filing of an administrative claim of discrimination.  The jury rendered a special verdict finding, among other things, Watkins was not terminated and Central Freight did not fail to rehire him, although those facts were not disputed at trial.  The trial court granted a motion for a new trial, concluding the jury's findings were without evidentiary support.

Central Freight contends the trial court misinterpreted the special verdict in granting a new trial and Watkins forfeited his claim by failing to seek resubmission of the special verdict to the jury.  In a protective cross-appeal, Watkins contends the jury's finding that Central Freight's failure to rehire him was not motivated by retaliation was not supported by the evidence.  We reverse the order granting a new trial and affirm the judgment rendered on the jury's special verdict.

# I. BACKGROUND

Watkins sued Central Freight and two of its employees, Aaron Holstein and Samuel Ballance, in April 2011. The complaint alleged that Watkins, an African-American, was employed by Central Freight from May 2008, until his discharge in January 2010.[1] Against Central Freight, the complaint stated claims for racial discrimination (first cause of action), adverse employment actions and failure to rehire in violation of public policy, also based on racial discrimination (third cause of action), failure to prevent discriminatory practices (fourth cause of action), failure to provide proper meal and rest breaks (fifth cause of action), failure to pay wages upon discharge (sixth cause of action), and four other claims that were eventually dismissed (seventh through 10th causes of action).[2] Against Holstein and Ballance, Watkins pleaded a single claim of harassment based on race (second cause of action), which was dismissed prior to trial.

Watkins worked as a delivery truck driver for Central Freight from May 2008, until his termination eight months later, at the end of January 2009. Six other drivers were hired by Central Freight after Watkins, five of whom were not African-American. Beginning in July 2008, Watkins began to perceive that he was receiving less favorable work assignments than the non-African-American drivers with less seniority. The pattern continued and intensified over time, and his complaints to his supervisors, Ballance and Holstein, and Central Freight's human resources department, were ineffective in remedying the problem.

Watkins and the six drivers with less seniority were all terminated within three days of each other. The terminations, which resulted in a company-wide total of 531 layoffs, occurred as part of a reduction in force dictated by Central Freight's headquarters after the company lost a large client. An executive in Texas allocated the seniority-based

---

[1] The complaint alleged Watkins was terminated in 2010; in fact, he was terminated in January 2009.

[2] The portion of the fifth cause of action alleging missed rest breaks was also dismissed.

layoffs among the company's local offices. The executive made the allocation on the basis of business considerations, without knowing the identity of the affected employees. The Hayward Terminal, where Watkins worked, was allocated seven layoffs. Holstein, the terminal manager who made personnel decisions in Hayward, testified he was unaware of the company's plans prior to being directed to lay off his seven most junior employees. Watkins was one of the seven.

Holstein said that when he terminated each of the seven employees, he explained the circumstances of the layoffs, told the employees they would be eligible for rehiring if work picked up, and instructed them to "call back and check in to see if there's any employment." As Holstein explained, he "felt like if they wanted the job, they would stay in contact with me. They would show me how bad they wanted to work."

Although Central Freight's business suffered for a time after the layoffs, it gradually became necessary to hire more drivers. In order to be rehired, the laid off drivers were required to reapply. Holstein testified he did not solicit any of the former employees to return, but he referred those who called to the human resources department to complete an application. In June 2009, early in the process of rehiring, Holstein prepared a written evaluation of the work performance of the seven laid-off employees for Central Freight's human resources department. At the end of his evaluation of Watkins, Holstein noted, "When laid off, instructions were given to call if interested to return back to work; never heard from [Watkins]." Within a year after the layoffs, at least seven drivers had been hired—the five non-African-American drivers who had been laid off, as well as at least two new employees. Holstein explained Watkins was not rehired because he "hadn't applied and I hadn't heard from him."[3]

Watkins filed a complaint of discrimination with the California Department of Fair Employment and Housing (DFEH) in mid-2009. Following the filing of the DFEH complaint, Holstein testified, he would have been unwilling to rehire Watkins, since the

---

[3] Contrary to Holstein's testimony, Watkins said when he was laid off Holstein told him "when things pick up he will call me." Watkins acknowledged he never affirmatively sought to be rehired by Central Freight.

complaint demonstrated Watkins was unhappy with the company. As Holstein said, "[I]f he's complaining about—making a filing is a complaint. Why would you bring him back and put him potentially back in that environment. It just—to me, it just didn't make sense."

The matter was submitted to the jury on a Tuesday morning. If the jury completed its deliberations on Wednesday, the court informed the jurors, it would be necessary for them to return on Thursday for delivery of the verdict. Because Juror No. 7 had a professional conflict that would prevent her attendance from Thursday through Sunday, the parties stipulated that she need not be present for delivery of the verdict, if one was reached on Wednesday. The jury did reach a verdict on Wednesday, and the next morning, with Juror No. 7 absent, the verdict was unsealed and read.[4]

The special verdict form, drafted by the court, was divided into sections corresponding to the causes of action. Section 1, labeled "Race Discrimination," contained three questions. Question No. 1.1 asked, in three subparts, whether Watkins was given less favorable work assignments, discharged, and not rehired:

**"QUESTION NO. 1.1**

"Did Central Freight Lines, Inc.: (please answer (a), (b), and (c) below)

"(a) Give David Watkins less favorable work assignments? **Yes** ___ **No** ___

"(b) Discharge David Watkins? **Yes** ___ **No** ___

"(c) Not rehire David Watkins? **Yes** ___ **No** ___

"If your answer to any part of this Question No. 1.1 is 'Yes' go on to Question No. 1.2.

"If you answered 'No' to all, stop here, do not answer any more questions in this section, and instead immediately proceed to Section 2 of this special verdict form."

Question No. 1.2 asked, in a single question, whether race was a motivating factor in any of the three actions mentioned in question No. 1.1. Finally, question No. 1.3 asked

---

[4] There is no transcript of court proceedings, if any, on Wednesday. We infer the submission of a sealed verdict on that day from comments made on Thursday.

4

whether any of those three actions, plus "retaliating against [Watkins]," was a substantial factor in causing Watkins harm. Although Central Freight's discharge and failure to rehire Watkins were not disputed at trial, the jury answered "no" to all three subparts of question No. 1.1 and did not answer the remaining questions.

Section 2, labeled "Wrongful Conduct in Violation of Public Policy," was divided into four questions. Question No. 2.1 was virtually identical to question No. 1.1, again asking, in three subparts, whether Watkins was given less favorable work assignments, discharged, and not rehired:

**"QUESTION NO. 2.1**

"Did Central Freight Lines, Inc.: (please answer (a), (b), and (c) below)

"(a) Give David Watkins less favorable work assignments? **Yes ___ No ___**

"(b) Discharge David Watkins? **Yes ___ No ___**

"(c) Not rehire David Watkins? **Yes ___ No ___**

"If your answer to any part of this Question No. 2.1 is 'Yes' go on to Question No. 2.2.

"If you answered 'No' to all, stop here, do not answer any more questions in this section, and instead immediately proceed to Section 3 of this special verdict form."

Question No. 2.2, in three subparts, asked whether Watkins complained to Central Freight about racially discriminatory actions and about alleged retaliation against him and whether he complained to DFEH about Central Freight's discrimination and retaliation. Question No. 2.3 asked whether Watkins's "race and/or complaints" were a motivating factor in the three actions addressed in questions Nos. 1.1 and 2.1. Like Question No. 1.3, question No. 2.4 addressed causation. Again, the jury answered "no" to the first three subparts of question No. 2.1 and did not answer the remaining questions.

Section 3, labeled "Failure to Prevent Discrimination or Retaliation," had three questions. Question No. 3.1, divided into three subparts, was as follows:

**"QUESTION NO. 3.1**

"Was David Watkins: (please answer (a), (b) and (c) below)

5

"(a) Subjected to discrimination because he was African American?

**Yes** ___ **No** ___

"(b) Subjected to retaliation because he opposed Central Freight Lines, Inc.'s unlawful and discriminatory employment practices? **Yes** ___ **No** ___

"(c) Subjected to retaliation because he filed a complaint with the California Department of Fair Employment and Housing? **Yes** ___ **No** ___

"If your answer to any part of this Question No. 3.1 is 'Yes' go on to Question No. 3.2.

"If you answered 'No' to all, stop here, do not answer any more questions in this section, and instead immediately proceed to Section 4 of this special verdict form."

Question No. 3.2 asked whether Central Freight failed to take reasonable steps to prevent the "discrimination and/or retaliation," and question No. 3.3 addressed causation. As with the prior two sections, the jury answered "no" to all three subparts of question No. 3.1 and did not respond to the remainder. Section 4, concerning damages, was left blank, consistent with the instructions of the special verdict form not to proceed if questions Nos. 1.3, 2.4, and 3.3 were not answered.

Section 5, corresponding in part to the fifth cause of action, addressed the failure to provide meal breaks. The jury found that Watkins worked through his meal breaks on 150 days and awarded $3,217.50 in compensation. In question No. 5.5, corresponding to the sixth cause of action, the jury found that Central Freight did not willfully fail to pay Watkins compensation for his missed meal breaks.

The jury was polled, and the responses were not entirely unanimous. With respect to question No. 1.1(a), regarding unfavorable work assignments, the vote was 10 to 2. With respect to the other two subparts of question No. 1.1, the jury was unanimous. On question No. 2.1(a), again concerning work assignments, the vote was 9 to 3. As with question No. 1.1, the poll on the final two subparts of question No. 2.1 was unanimous. On question No. 3.1(a), which asked whether Watkins was subjected to race-based discrimination, the vote was 11 to 1, but the differing juror later changed his or her vote

6

to make the tally unanimous.[5]  When the polling reached question No. 3.1(b), concerning retaliation for Watkins' opposition to discriminatory practices, the vote was found to be 8 to 4.  Because the state Constitution requires three-fourths agreement among members of a civil jury (Cal. Const., art. I, § 16), a vote of 8 to 4 was insufficient to resolve that question.

Upon discovering the failure to reach the required super-majority on question No. 3.1(b), the court retreated to a sidebar, suggesting to counsel that the jury be reconstituted with an alternate and directed to begin deliberations again, given the unavailability of Juror No. 7.  Before settling on a course of action, the court and counsel were informed that one of the jurors made a mistake in reporting his or her vote on that subpart, mooting the need for further deliberation.  By that time, however, counsel for Watkins had claimed the responses to questions Nos. 1.1(a) and 2.1(a) were "inconsisten[t]," apparently because the jury's vote was different on these two questions.  Further, counsel for Central Freight addressed the anomaly in the responses to questions Nos. 1.1 and 2.1, in which the jury found that Watkins was not discharged and Central Freight did not fail to rehire him, even though it was undisputed those actions did, in fact, occur.  Defense counsel suggested the responses embodied a determination that the discharge and failure to rehire were not racially motivated, to which the court responded, "[T]hat's just wrong.  That's not what they were supposed to do.  They were supposed to make a factual determination."  The court suggested it would direct the jury to "start their deliberations all over again . . . and then fill[] out another jury verdict form."  Watkins's attorney appeared to concur, saying, "It seems pretty obvious that they jumped the gun and converted a special verdict form into a kind of general verdict form.  I wonder if it's necessary to remind them that they have to go through each section and answer it specifically."  The court responded, "we can reinstruct them on that," and asked, "Any other thoughts in terms of what we do?"  Both counsel answered, "Not now."

---

[5] See footnote 6, *post*.

7

At this point, the sidebar ended, and the jury was polled again on question No. 3.1. When the poll reached question no. 3.1(b), the result was 9 to 3.[6] The poll continued with question No. 3.1(c), addressing retaliation for filing a FEHA complaint. The vote was 11 to 1. The court stopped the proceedings at this point, saying, "we are going to need to clarify a couple of things," and conducted another conference with counsel. Instead of suggesting further deliberations to resolve the anomaly of questions Nos. 1.1 and 2.1, as before, the court merely suggested the jury be polled again on questions Nos. 1.1(a) and 2.1(a) to determine whether there was an inconsistency in the votes. Counsel agreed. No reference was made by either counsel or the court to the earlier plan to reinstitute deliberations.

The jury was then polled on the remaining questions and found to have voted 11 to 1 on each of the subparts of question No. 4.1. The remaining responses were unanimous, with the exception of question No. 5.5, a 9-to-3 vote. The second time through on questions Nos. 1.1 and 2.1 produced the same results as before, replicating what Watkins's counsel and the court had characterized as an inconsistency.[7]

The court subsequently asked to "see counsel . . . in chambers" and conducted an untranscribed conference with counsel. Immediately after the conference, the court, without further explanation, "declare[d] the verdict to be complete," directed its entry, and dismissed the jurors. Following dismissal of the jury, the court summarized the untranscribed conference as follows: "[U]nder all of the circumstances, the Court concluded that we would accept the verdict today and to discharge the jury and deal with any issues related to it later on, in connection with any motions for new trial that may follow." Neither attorney registered an objection. Judgment was entered on the special

---

[6] The transcript shows that Juror No. 4, the same juror who had reported a mistake on question No. 3.1(b), also changed his vote on question No. 3.1(a) in the second poll, making the second poll on question No. 3.1(a) unanimous. The court noticed the difference from the initial poll results and confirmed that the second poll was in fact unanimous, but it did not pursue the reason for the change in vote.

[7] This type of inconsistency does not render a special verdict invalid. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 255, fn. 8 (*Keener*).)

verdict on November 13, 2012, awarding Watkins damages of $3,217.50 on the fifth cause of action and finding for Central Freight on the remaining claims.

Shortly thereafter, Watkins moved for a partial judgment notwithstanding the verdict (JNOV) and a new trial, arguing, among other grounds, the jury's findings that Watkins had not been discharged and Central Freight did not fail to rehire him were not supported by the evidence. In opposition, Central Freight argued Watkins was "misreading" the special verdict form, which should be understood to represent a finding that Watkins suffered no adverse employment actions motivated by racial discrimination.

Central Freight also argued Watkins forfeited his argument by failing to seek any corrective action in connection with the anomalies in the special verdict form while the jury was still impaneled. In connection with this argument, counsel for Central Freight submitted a declaration stating that, during discussions regarding the special verdict, he had raised the issue of the anomaly in the answers to questions Nos. 1.1 and 2.1. In response to these arguments, counsel stated, Watkins's attorney "did not request the Court to interrogate the jury for the purpose of ascertaining the thinking of the jurors when they gave their answers to subdivision (b) and (c) of Question 1.1." In addition, "Counsel for Watkins did not request, and the Court did not order, the jury go back into deliberations, with alternative Juror No. 13, who was present, replacing absent Juror No. 7, so that deliberations could begin all over again." Counsel for Watkins submitted a declaration in reply to Central Freight's opposition to the new trial motion, but the declaration did not contradict Central Freight's claim that Watkins's counsel had not sought further deliberations or other relief in connection with the special verdict. Similarly, although Watkins argued in his reply brief that the failure to object did not forfeit a challenge to the special verdict, he did not contend an objection had, in fact, been made.

The court issued written orders denying the JNOV motion but granting a new trial. With respect to the motion for a new trial, the court accepted the jury's special verdict at face value, noting it was undisputed Watkins was discharged and not rehired, yet the jury answered "no" to questions about these events. As a result, the court concluded, those

findings were not supported by the evidence. The court also noted there was evidence from which the jury could have found Watkins was treated unfavorably as a result of his race. The court rejected Central Freight's argument that the special verdict should be read as finding no discriminatory conduct, noting Central Freight had not presented any juror declarations to that effect or legal authority to support the argument.[8] To accept Central Freight's argument, the court held, "one would have to conclude that the jurors completely ignored the Court's instructions and answered questions they chose first to construct, and then to answer all on their own. The court is not willing to engage in such speculation."

In rejecting Central Freight's waiver argument, the court noted that in the untranscribed conference with counsel, "The court concluded that it was not proper under the circumstances presented here to send the jury back (with an alternate . . . ), and direct it to change its answers to [questions Nos. 1.1 and 2.1] and then continue to deliberate on the other questions. [Citations.] The court concluded that the findings were so contrary to the facts that the issue must be dealt with on a motion for new trial, and the court so advised counsel." Accordingly, the court determined, there was no basis to find that Watkins's counsel attempted to gain a tactical advantage in failing to seek further deliberations. A new trial was ordered as to all of Watkins's claims.

## II. DISCUSSION

Central Freight has appealed from the order granting a new trial, while Watkins filed a protective cross-appeal from the judgment.[9]

---

[8] The trial court's order also included a justification of the form of the special verdict. Because the special verdict forms proposed by counsel "were inadequate or unwieldy," the order explained, the court itself prepared the form submitted to the jury, attempting to "synthesize the verdicts into a comprehensible form." No objection to the form was raised by counsel. While recognizing "the court normally does not submit undisputed issues to the jury," the order noted the issue of less favorable work assignments was in dispute, "so the jury would have had to make a finding on that issue in all events."

[9] For the first two-thirds of its opening brief, Central Freight presents a variety of arguments to support the entry of judgment in its favor. Because judgment was, in fact,

**A.** *Grant of a New Trial*

   **1.** *Interpretation of the Special Verdict*

Central Freight contends the trial court misinterpreted the special verdict. We agree and conclude that, properly interpreted, the special verdict provided no basis for granting a new trial.

The law relating to new trial motions was recently summarized in *Buckner v. Milwaukee Electric Tool Corp.* (2013) 222 Cal.App.4th 522 (*Buckner*): "A new trial may be granted on all or part of the issues on the ground of '[i]nsufficiency of the evidence to justify the verdict or other decision.' [Citation.] A new trial shall not be granted on this ground 'unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision.' " (*Id.* at p. 530.)

The standard of review for such a motion is ordinarily deferential: " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' [Citation.] . . . ' "[T]he presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order." [Citation.]' [Citation.] 'The reason for this high level of deference is the trial court is much closer to the evidence than a reviewing court and sits as a trier of fact independent of the jury.' " (*Buckner, supra,* 222 Cal.App.4th at p. 530.)

Notwithstanding the norm for a new trial motion, a deferential standard of review is inappropriate here. As explained above, the grant of a new trial typically results from the trial court's independent review of the evidence, sitting as a trier of fact, and the deferential standard of review recognizes the court's role as fact finder. Here, in contrast,

---

entered largely in its favor, and because Central Freight does not challenge the jury's verdict on the one cause of action on which Watkins prevailed, these arguments are largely beside the point, and we disregard them. As Watkins argues, Central Freight's appeal was taken from the grant of a new trial, and we therefore address the propriety of that grant in addressing Central Freight's appeal.

the trial court's grant of a new trial was not based on an independent review of the evidence. Rather, its conclusion the jury erred followed directly from its understanding of the special verdict form, according to which the jury found facts to be true that were *incontestably* not true. The basis for the trial court's ruling was therefore its interpretation of the special verdict form, not its weighing of the evidence. On that issue, the interpretation of a special verdict form, the standard of review is de novo, as discussed below.[10]

"When no objection is made that a special verdict is ambiguous or incomplete before the jury is discharged, 'it falls to "the trial judge to interpret the verdict from its language considered in connection with the pleadings, evidence and instructions." [Citations.] Where the trial judge does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct interpretation. [Citations.] If the verdict is hopelessly ambiguous, a reversal is required . . . ." (*Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 542.)

When interpreting a special verdict, "reference may be made to the pleadings, the evidence and the court's instructions. [Citations.] . . . 'In determining the sufficiency of the verdict the entire record should be searched and all the parts interpreted together, so that if possible a deficiency in one place may be cured by what appears in another.' [Citation.] Accordingly, it is the rule that all reasonable inferences will be indulged on appeal to support, rather than defeat, a jury's verdict . . . ." (*Fransen v. Washington* (1964) 229 Cal.App.2d 570, 574.) " 'A verdict should be interpreted so as to uphold it and to give it the effect intended by the jury, as well as one consistent with the law and

---

[10] Plaintiff cites *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, in which the Supreme Court repeated the abuse of discretion standard in reviewing the grant of a new trial, holding, "So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside." (*Id.* at p. 387.) The new trial motion in *Jiminez* was granted after the trial court concluded instruction on a theory of law had been improperly refused. Although the Supreme Court cited the abuse of discretion standard, it reviewed the trial court's instructional holding as a matter of law in affirming the decision to grant a new trial. (*Id.* at p. 386.)

the evidence.' " (*All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1223.) We are not bound by the trial court's interpretation of the special verdict. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.) For this reason, notwithstanding the ordinarily deferential standard of review, when the grant of a new trial is based on the interpretation of a special verdict, we review the ruling de novo. (*McCoy v. Gustafson* (2009) 180 Cal.App.4th 56, 93–94; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678.)

The trial court interpreted the responses to questions Nos. 1.1 and 2.1 literally. While the "plain language" approach is generally appropriate, it failed under the unique circumstances of this case. The jury's vote was unanimous on the issues of discharge and rehire. Yet it is inconceivable the jury meant to convey its uniform and sincere belief Watkins was never discharged by Central Freight or Central Freight did not fail to rehire him. The testimony was extensive and undisputed that Central Freight did discharge Watkins and did not rehire him. No rational jury—and nothing in the record suggests this jury was anything other than rational—could have sat through the trial and come to a contrary result. To conclude, as the trial court held, that the jury actually meant to convey its belief that Watkins was not discharged and was not denied rehiring fails to give due credit to the jury.

In seeking to understand the jury's meaning, we note there is a good reason why, as the trial court noted, courts normally do not submit undisputed facts to the jury. To ask the jury to make a finding as to an undisputed fact is inherently confusing because it necessarily suggests there is a decision to be made about the fact—in other words, that the fact might not be undisputed. In this case, the special verdict asked, "yes" or "no," whether Watkins was discharged and not rehired. Nothing in the form indicated "no" was a "wrong" answer, thereby implying "no" was an acceptable alternative. The confusion was amplified because the special verdict form instructed the jury that if it answered "no" to the first three subparts of questions Nos. 1.1 and 2.1, "stop here, do not answer any more questions in this section, and instead immediately proceed" to the next

13

section.  This reinforced, indeed confirmed, the implication that answering "no" to the first three subparts was an appropriate response.

By suggesting to the jurors that responses they knew to be wrong might, to the contrary, be correct, the special verdict form invited the jurors to speculate they simply misunderstood the meaning of questions Nos. 1.1 and 2.1—in other words, these facially simple questions had a more complex meaning permitting them to be answered either way.  From that, it is a fairly short jump to concluding the questions were intended to incorporate the entirety of the cause of action:  not merely whether Watkins was discharged or not rehired, matters not in dispute, but whether he was *wrongfully* discharged and not rehired.  If that further qualification is read into the questions, they can rationally be answered either way, consistent with the jurors' findings.  As Central Freight argues, the use of the sectional headings, "Race Discrimination" and "Wrongful Conduct in Violation of Public Policy," encouraged this approach.  We have no doubt this is precisely what happened.  The jury's answers to questions Nos. 1.1 and 2.1 must be interpreted to mean that Watkins was not given less favorable work assignments, discharged, and not rehired for *discriminatory* reasons.

We find substantial support for that interpretation in the jury's response to the questions in section 3, entitled "Failure to Prevent Discrimination or Retaliation."  In those responses, the jury found Watkins was not "subjected to discrimination because he was African American," and that he was not "[s]ubjected to retaliation" for speaking out about perceived discriminatory employment practices or filing an administrative charge of discrimination.  Given the generality of the section 3 title, which appears to refer to discrimination in any form, the unqualified finding of no racial discrimination in the first subpart would presumably apply as well to the actions addressed in questions Nos. 1.1 and 2.1.  The jury's unanimous finding of no racial discrimination in section 3 therefore constitutes a rejection of the factual premise for each of Watkins's discrimination claims, supporting the interpretation of the responses to questions Nos. 1.1 and 2.1 as indicating Watkins was not subjected to discriminatory employment practices.  Considering the special verdict as a whole, it is evident the jury concluded that Watkins did not suffer

14

racial discrimination during his employment by Central Freight, and the responses to questions Nos. 1.1 and 2.1 must be interpreted consistently with that conclusion.

In arguing in support of the trial court's grant of a new trial, Watkins mischaracterizes Central Freight's argument, contending Central Freight is attempting to treat the special verdict as a general verdict. On the contrary, Central Freight is properly arguing for a commonsense interpretation of the special verdict, as a special verdict. Watkins also notes the trial court rejected this position because Central Freight failed to present juror declarations or legal authority. It is by no means clear that juror declarations would be admissible on this issue, given the general rule against evidence of a jury's thought processes. (See Evid. Code, § 1150; *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75.) As discussed above, the interpretation of a verdict is a matter for the court, and there is substantial case law supporting the power of the trial and appellate courts to interpret a verdict.[11]

### 2. *Waiver*

Central Freight also contends Watkins forfeited any challenge to the special verdict when his attorneys failed to request resubmission of the issues to the jury. Again, we agree.

As discussed above, the anomaly in the special verdict form was raised by Central Freight's counsel during the court's initial conference with counsel during the polling of the jury. When the court suggested it would require further deliberation, Watkins's attorney agreed that the special verdict was defective. Despite this recognition, counsel did not object when, during the second conference, the court made no reference to further deliberations. Further, there is nothing in the record to suggest Watkins's counsel requested further deliberations during the final, untranscribed conference, nor is there any record of an objection to the trial court's decision to accept the special verdict form as is.

---

[11] Watkins also argues the special verdict is not ambiguous. As discussed at length in the text, the special verdict is plainly subject to two differing interpretations. Nothing more is needed to create an ambiguous verdict.

15

On the contrary, the statement in the declaration of Central Freight's attorney that no such objection was made is uncontroverted.

We therefore conclude that Watkins's attorney, while aware of the anomaly represented by questions Nos. 1.1 and 2.1 of the special verdict, made no attempt to have the jury clarify the matter. On the contrary, despite acknowledging during the polling that the jury had "jumped the gun and converted a special verdict form into a kind of general verdict form," Watkins's attorneys allowed the special verdict to be accepted without objection. Only later, after the jury could no longer be consulted on the issue, did Watkins seek to have the special verdict overturned, filing a motion for a new trial on the grounds the verdict was not supported by the evidence.

When the jury renders a patently ambiguous special verdict, the law is clear, it is the duty of counsel to bring the ambiguity to the attention of the court and the duty of the court to require further deliberations to resolve the ambiguity. (Code Civ. Proc., § 619; *Montoya v. Barragan* (2013) 220 Cal.App.4th 1215, 1230.) "If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357.)

There is some conflict, however, in the Supreme Court's rulings with respect to the forfeiture of a later claim when no effort is made at clarification. In general terms, the court has held: " 'Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected.' [Citation.] . . . [¶] . . . [¶] . . . ' " ' " ' . . . The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.' " ' " ' " (*Keener, supra,* 46 Cal.4th 247, 263–265, italics and fn. omitted.) In *Keener*, the court found a claim based on one juror's failure to respond during polling

16

was forfeited when not brought to the court's attention at the time of the omission, since "the incomplete polling . . . was indeed '*apparent* at the time the verdict was rendered and could have been corrected.' " (*Id.* at p. 267, italics added by *Keener*.)

Weighed against this general rule is the court's dictum discussion in a footnote in *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452 (*Woodcock*): "Frequently, failure to object to the form of a verdict before the jury is discharged has been held to be a waiver of any defect. [Citations.]  However, waiver is not automatic, and there are many exceptions. [Citations.] [¶] Waiver is not found where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' [Citations.] . . . [W]aiver is not an issue where a defect is latent and there is no hint of 'litigious strategy.' [¶] There was no waiver here because, in light of the instructions, the verdict was not ambiguous. [Citation.]  Accordingly, there was nothing to clarify. . . ." (*Id.* at pp. 456–457, fn. 2.)

The Supreme Court attempted to reconcile the two rules toward the end of *Keener*. In response to the appellant's claim, quoting *Woodcock,* that "there is no indication that their failure to object was 'the result of a desire to reap a "technical advantage" or engage in a "litigious strategy," ' " the court distinguished *Woodcock* as applying only when a verdict is ambiguous, rather than the defective polling present in *Keener*. (*Keener, supra*, 46 Cal.4th at pp. 269–270.)  Further, the court noted, the rule of *Woodcock* applies when the ambiguity is latent, while the defect in *Keener* "must be characterized as apparent, and not latent." (*Id.* at p. 270, fn. 31.)  We conclude, based on this latter observation in *Keener*, that, notwithstanding the dictum in *Woodcock*, a party forfeits a later claim of error based on an apparent, correctible ambiguity in a special verdict when no request for clarification is made prior to discharge of the jury.  When a party fails to object and seek clarification of an ambiguity that is apparent, there can be no inference other than the party has consciously elected to forgo clarification as a "litigious strategy."

The defect in this special verdict was obvious upon even a superficial reading of the form.  Indeed, it was sufficiently apparent that Central Freight brought the issue to the court's attention, Watkins's counsel acknowledged the ambiguity and speculated on its

17

cause, and the court declared its intention to remedy the problem. Further, the ambiguity could have been readily resolved, either by substituting an alternate juror and instructing the jury to begin deliberations anew, as the court suggested at the time, or by continuing the matter until Juror No. 7 was available for further deliberations. In light of the apparent nature of the ambiguity and its ready resolution, we conclude that Watkins's failure to insist on resubmission of the special verdict form to the jury forfeited his later request for a new trial.[12]

## B. *Watkins's Cross-appeal*

Because we reverse the order granting a new trial and reinstate the judgment, we must address Watkins's cross-appeal. Watkins contends the jury's conclusion that Central Freight did not retaliate against him by failing to rehire him as a result of his filing of the DFEH claim was not supported by the evidence, in light of Holstein's testimony that the filing caused him to be unwilling to rehire Watkins.

"When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review." (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.) Under this standard, "[a]ll conflicts in the evidence are resolved in favor of the prevailing party, and all reasonable inferences are drawn in a manner that upholds the verdict." (*Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 445.) "[W]e do not evaluate the credibility of the witnesses or otherwise reweigh the evidence. [Citation.] Rather, 'we defer to the trier of fact on issues of credibility.' " (*Escamilla v. Department of Corrections & Rehabilitation* (2006) 141 Cal.App.4th 498, 514–515.) "In short, even if the judgment of the trial court is against the weight of the evidence, we are

---

[12] In making this ruling, we acknowledge the trial court ultimately ruled the matter would not be resubmitted to the jury. From the limited evidence available, however, the decision appears to have been made on the basis of the purported inconsistency in some of the responses, rather than a consideration of the ambiguity. Further, and more importantly, there is no way to know what the ruling of the court would have been had Watkins's counsel not acquiesced without objection to the court's plan. To preserve a claim based on the ambiguity, Watkins's counsel had a duty, at a minimum, to object to the court's decision not to resubmit the matter.

bound to uphold it so long as the record is free from prejudicial error and the judgment is supported by evidence which is 'substantial,' that is, of ' "ponderable legal significance," ' ' "reasonable in nature, credible, and of solid value . . . ." ' " (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

Under Government Code section 12940, "One unlawful employment practice . . . is '[f]or any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.' (Subd. (h).) This form of unlawful employment practice is often called simply 'retaliation.' " (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1161–1162.) "To establish a prima facie case of retaliation, the plaintiff must show he or she engaged in a 'protected activity,' the employer subjected the employee to an adverse employment action, and a causal link existed between the protected activity and the employer's action." (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 386.)

Watkins contends it was undisputed Holstein was unwilling to rehire him because he had filed an administrative charge of discrimination. While this is true, it gives an incomplete account of the failure to rehire. Holstein testified that in order to be rehired, an employee was required to reapply for work. When former employees contacted him seeking to be rehired, he directed them to fill out an application. Because Watkins never contacted Holstein or otherwise expressed an interest in returning to Central Freight, and because he failed to reapply for work, the issue of his rehiring never arose, and his filing of the DFEH claim never became a factor in Central Freight's failure to rehire him. Accepting Holstein's account, while he may have harbored an intent to retaliate, that intent had no causal connection to the actual failure to rehire, which occurred merely because Watkins never sought to be rehired. The jury was entitled to accept Holstein's testimony on the matter, which was " ' "reasonable in nature, credible, and of solid value . . . ." ' " (*Howard v. Owens Corning, supra,* 72 Cal.App.4th at p. 631.)

19

Watkins argues Holstein engaged in a "recruiting activity" that excluded Watkins when he sought out two of the other former employees but made no similar effort to locate Watkins.  (See Cal. Code Regs., tit. 2, §§ 11015, 11016.)[13]  While there was testimony Holstein sought out certain past employees, Holstein denied having done so, saying he merely directed former employees who contacted him to fill out applications for rehire.  Again, this testimony provides substantial evidence to support the jury's verdict.

## III.  DISPOSITION

The trial court's order granting a new trial is reversed, and the judgment entered on November 13, 2012, is affirmed.  Central Freight shall recover costs on appeal.


_____
Margulies, J.


We concur:


_____
Humes, P.J.


_____
Banke, J.

_____

[13] California Code of Regulations, title 2, section 11016, subdivision (a)(1) states: "Any employer . . . engaged in recruitment activity shall recruit in a non-discriminatory manner."  Section 11015, subdivision (a) defines "recruitment" as "[t]he practice of any employer or other covered entity that has the purpose or effect of informing any individual about an employment opportunity, or assisting an individual to apply for employment, an activity leading to employment, . . . or referral by an employment agency."

20